## OCEANIC STEAM NAVIGATION COMPANY *v.* STRANAHAN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 509.　Argued January 11, 12, 1909.—Decided June 1, 1909.

Money paid to the collector of a port under protest, and on the certainty that if not paid clearance to vessels necessarily sailing on definite schedule would be refused, to the great damage of the owner, is paid involuntarily, and can, if unlawfully exacted, be recovered.

Congress has power to deal with the admission of aliens and to confide the enforcement of laws in regard thereto to administrative officers. *United States* v. *Ju Toy,* 198 U. S. 253.

In construing a congressional statute this court may consider the re-

port of the committee as a guide to its true interpretation in order to dispel ambiguity, if any exists. *The Delaware,* 161 U. S. 459; *Buttfield* v. *Stranahan,* 192 U. S. 470.

It is within the competency of Congress, when legislating as to matters exclusively within its control, to impose appropriate obligations and sanction their enforcement by reasonable money penalties, giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power.

The authority, given by Congress in the Alien Immigration Act to the Secretary of Commerce and Labor to impose an exaction on a transportation company bringing to the United States an alien immigrant afflicted with a loathsome contagious disease when the medical examination establishes that the disease existed, and could have been detected by medical examination at the time of embarkation, does not purport to define and punish any criminal offense, but merely entails the infliction of a penalty enforceable by civil suit; and it is within the power of Congress to provide for such imposition by an executive officer, and the enforcement is not necessarily governed by the rules controlling the prosecution of criminal offenses. *Wong Wing* v. *United States,* 163 U. S. 228, distinguished; *Hepner* v. *United States,* 213 U. S. 103, followed.

The constitutional right of Congress to enact legislation in regard to a matter wholly within its jurisdiction is the sole measure by which the validity of such legislation is to be determined by the courts; and the courts cannot proceed on the supposition that harm will follow if the legislature be permitted full sway and, in order to correct the legislature, exceed their own authority, and assume that wrong may be done in order to prevent wrong being accomplished. *McCray* v. *United States,* 195 U. S. 27.

The imposition of a penalty by an executive officer when authorized by Congress in a matter wholly within its competency, such as alien immigration, is not unconstitutional under the Fifth Amendment as taking property without due process of law.

The courts cannot make mere form and not substance the test of the constitutional power of Congress to enact a statute in regard to a matter over which Congress has absolute control.

The prohibition of § 9 of the Alien Immigration Act of March 3, 1903, c. 1012, 32 Stat. 1213, against bringing into the United States alien immigrants afflicted with loathsome and contagious diseases is within the absolute power of Congress; and that provision of the act is not unconstitutional because it provides that the Secretary of Commerce and Labor may, without judicial trial, impose upon, and exact

penalties from, the transportation company for violations of the provisions.

The greater includes the less and where Congress has power to sanction a prohibition by penalties enforcible by executive officers without judicial trial on the ascertainment in a prescribed manner of certain facts, the person upon whom the penalty is imposed is not entitled to any hearing in the sense of raising an issue and tendering evidence as to the facts so ascertained, and is not, therefore, denied due process because the time which the executive officer allows him after notice of the ascertainment and imposition to produce evidence as to certain facts on which the fine might be remitted is too short.

155 Fed. Rep. 428, affirmed.

The facts, which involve the constitutionality of § 9 of the Alien Immigration Act of March 3, 1903, are stated in the opinion.

Mr. William G. Choate and Mr. Lucius H. Beers for plaintiffs in error:

Plaintiffs in error were deprived of their property without due process of law, because the fines were imposed in some cases without any previous notice and in all cases without any, or any adequate, opportunity to be heard. If under § 9 fines may be imposed without notice and without opportunity to be heard, Congress exceeded its power; and if § 9 did not have that meaning, then the Department of Commerce and Labor exceeded its powers. In either case the imposition of the fine was illegal.

The Fifth Amendment left Congress without power to authorize any court or officer to take property without giving the owner previous notice and opportunity to be heard. *Pennoyer v. Neff,* 95 U. S. 714, 733; *Scott v. McNeal,* 154 U. S. 34, 46, 50; *Simon v. Craft,* 182 U. S. 427; *Central Railway v. Wright,* 207 U. S. 127; *Stuart v. Palmer,* 74 N. Y. 183; *Santa Clara v. So. Pac.,* 18 Fed. Rep. 385, 424; *Cooper v. Wandsworth,* 14 C. B., N. S. 180; *King v. The Chancellor,* 1 Strange, 557; *Security Trust Co. v. Lexington,* 203 U. S. 323, 333; *Roller v. Holly,* 176 U. S. 398, 409.

Reasonable opportunity to be heard is just as necessary as reasonable notice.    *Londoner* v. *Denver*, 210 U. S. 373, 378, 386.

Section 9 violates Art. III of the Constitution relating to the judiciary and also the Fifth Amendment relating to the taking of property without due process of law, because it authorizes the taking of property without judicial trial.

While in dealing with the alien himself and in determining any matter which relates to his admissibility Congress has full power and is not restrained by the Constitution from authorizing executive officers to take all necessary steps in regard thereto, § 9 is not a part of the system of inquiry necessary for that purpose.    Its purpose is to require a competent medical examination at foreign ports and it requires a fine to be imposed when the Secretary is satisfied that the disease could have been detected by such an examination.    Section 9 imposes a punishment and requires money to be taken in payment of a fine, and it therefore deals with personal and property rights which are protected by the Constitution.    See *Wong Wing* v. *United States*, 163 U. S. 228, 237; *United States* v. *Burke*, 99 Fed. Rep. 895, 900; *Boyd* v. *United States*, 116 U. S. 616, 634; *Lees* v. *United States*, 150 U. S. 476; *Union Bridge Co.* v. *United States*, 204 U. S. 364.

These cases are clearly distinguishable from cases where this court has sanctioned the taking of property by the Government without a judicial trial and has placed the determination of the fact on which liability rests on an executive officer, because all of those cases rest upon the existence of an imperative necessity for prompt and summary determination while that necessity does not exist here.    See *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272.

These fines now in question must either be fines in punishment for crime or penalties imposed for the doing of an unlawful or prohibited act not technically a crime.    If they are fines imposed in punishment for crime, then the provisions of the Constitution relating to trial for crime apply.    If they are

penalties merely, then the recovery of those penalties would properly be the subject of civil actions, and, in that event, these cases come under the classification of ordinary civil actions, which Congress cannot withdraw from judicial cognizance. See also *Springer* v. *United States*, 102 U. S. 586, 593; *In re Rapier*, 143 U. S. 110, 134; *Public Clearing House* v. *Coyne*, 194 U. S. 497; *Lawton* v. *Steele*, 152 U. S. 133, 136, and *Buttfield* v. *Stranahan*, 192 U. S. 470, discussed and distinguished.

It was not in the power of Congress to authorize the Secretary of Commerce and Labor to take private property in the form of a fine without any proof that the alleged offense had been committed.

This is punishment by executive order instead of by judicial procedure and no temporary clamor in favor of peremptory methods can warrant such a change in our institutions.

Section 9 violates the Sixth Amendment inasmuch as it denies to the accused in a criminal prosecution the right to a jury trial.

A suit for a penalty for an act prohibited by a statute of the United States is a criminal prosecution within the meaning of the Sixth Amendment.

It is not the form, but the nature of the action, which determines whether it is criminal or civil. *Iowa* v. *Chi., B. & Q. R. R. Co.*, 37 Fed. Rep. 497.

*Boyd* v. *United States*, 116 U. S. 616, 633, held that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal and within the reason of criminal proceedings for all the purposes of the Fourth Amendment, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself.

Under the same reasoning they are "criminal prosecutions" within the meaning of the Sixth Amendment. *Lees* v. *United States*, 150 U. S. 476, 480.

*Mr. Wade H. Ellis,* Assistant to the Attorney General, with whom *Mr. Henry L. Stimson, Mr. Winfred T. Denison* and *Mr. E. P. Grosvenor* were on the brief, for defendant in error:

Congress is granted by Art. I, § 8 of the Constitution plenary power to regulate the bringing of aliens to our shores; and its acts within that field are valid unless they violate some explicit restriction of the Constitution. *Nishimura Ekiu* v. *United States,* 142 U. S. 651, 659; *Turner* v. *Williams,* 194 U. S. 279, 290; *Head Money Cases,* 112 U. S. 580, 595; *Passenger Cases,* 7 How. 283; *Commissioners* v. *North German Lloyd,* 92 U. S. 259; *Chy Lung* v. *Freeman,* 92 U. S. 275; *People* v. *Compagnie Générale,* 107 U. S. 59.

It is also a part of the inherent control of the sovereign over its boundary line. *Fong Yue Ting* v. *United States,* 149 U. S. 698; *Chinese Exclusion Case,* 130 U. S. 581; *Turner* v. *Williams, supra; Nishimura Ekiu* v. *United States, supra.*

Within such fields acts of Congress are constitutional unless they fall under some specific prohibition of the Constitution. *Buttfield* v. *Stranahan,* 192 U. S. 470; *Lottery Case,* 188 U. S. 321, 353, 356; *Leisy* v. *Hardin,* 135 U. S. 100, 108; *Fairbank* v. *United States,* 181 U. S. 283, 285.

Section 9 falls under no such prohibition.

Section 9 does not create an offense within the meaning of the word "crime" as used in the constitutional provisions requiring a jury trial.

The penalty provided by § 9 is one of that long-established and well-recognized class of penalties which do not rise to the seriousness or dignity of crimes, but which may be recovered by procedure civil in form. Into such penalties the punitive element admittedly enters, but it has more of the character of punitive damages in tort than of criminal punishment. The Constitution has not imposed limitations as to the method to be prescribed by Congress for the recovery of these penalties, the only limitations which it has imposed being in relation to crimes. *Schick* v. *United States,* 195 U. S. 65, 67; *United States* v. *Zucker,* 161 U. S. 475, 481; *Callan* v. *Wilson,* 127 U. S. 540,

549, 552; *Ex parte Wilson*, 114 U. S. 417, 425; *Taylor* v. *United States*, 3 How. 197, 210; *Lawton* v. *Steele*, 152 U. S. 133, 141; *United States* v. *Ju Toy*, 198 U. S. 253.

If the statute does not create a "crime," then *a fortiori* it does not create an "infamous crime" within the meaning of the Fifth Amendment. *Wong Wing* v. *United States*, 163 U. S. 228, distinguished, and see *Li Sung* v. *United States*, 180 U. S. 486, 495; *Re Ah Yuk*, 53 Fed. Rep. 781; *United States* v. *Wong Dep Ken*, 57 Fed. Rep. 203, 211; *United States* v. *Hung Chang*, 134 Fed. Rep. 19, 24.

The words "infamous crime" have been defined as applying to those crimes which were punishable by imprisonment or other infamous punishment. *Ex parte Wilson*, 114 U. S. 417; 425, *supra; Callan* v. *Wilson*, 127 U. S. 540, *supra; Mackin* v. *United States*, 117 U. S. 348; *United States* v. *Ebert*, 25 Fed. Cas. 972.

The fact that the section uses the word "fine" instead of the word "penalty" does not necessarily indicate an intention to create a crime, for the words "fine" and "penalty" are interchangeable. *Cunard Steamship Co.* v. *Stranahan*, 134 Fed. Rep. 318; note to 1 Bishop, Crim. Law (7th ed., 17*n*), and note to *Reg.* v. *Paget*, 3 Foster and F., citing *Reg.* v. *Charley*, 12 E. and B. 515; *Reg.* v. *Russell*, 3 E. and B. 942.

There are many statutory precedents for penalties to be recovered civilly as debts. See § 4965, Rev. Stat., providing a money penalty for infringement of a copyright, and in *Werckmeister* v. *American Tobacco Co.*, 207 U. S. 375, it was held that the United States, though entitled to one-half the penalty, need not be a party to the proceeding. See also *Chaffee* v. *United States*, 18 Wall. 516, 538; *Stockwell* v. *United States*, 13 Wall. 531, 542; *Proctor* v. *People*, 24 Ill. App. 599; *Ferguson* v. *People*, 73 Illinois, 559; *United States* v. *Whitcomb Co.*, 45 Fed. Rep. 89, 90; *United States* v. *Railway Co.*, 44 Fed. Rep. 769.

In committing the enforcement of the provisions of § 9 to an administrative or executive officer, Congress did not violate

the provision of the Constitution relating to the judicial power. *Helwig* v. *United States*, 188 U. S. 605, 611; *Passavant* v. *United States*, 148 U. S. 214, 221; *Origet* v. *Hedden*, 155 U. S. 228, 236; *Doll* v. *Evans*, 7 Fed. Cas. No. 3,969; *Clay* v. *Swope*, 38 Fed. Rep. 396; *Commonwealth* v. *Byrne*, 20 Gratt. (Va.) 165.

The only safe and efficient method by which Congress could provide for the determination of the questions of fact arising under this section was by administrative process. For many years it has been the policy of the United States to entrust the determination of practically the same issues of fact to administrative officers. *United States* v. *Ju Toy*, 198 U. S. 253; *United States* v. *Sing Tuck*, 194 U. S. 161, p. 170; *Japanese Immigrant Case*, 189 U. S. 98; *Chinese Exclusion Case*, 130 U. S. 581; *Turner* v. *Williams*, 194 U. S. 279, *Nishimura Ekiu* v. *United States*, 142 U. S. 651, *Chin Bak Kan* v. *United States*, 186 U. S. 193; *Fok Yung Yo* v. *United States*, 185 U. S. 296; *Lem Moon Sing* v. *United States*, 158 U. S. 538.

Section 9 does not violate the due process clause of the Fifth Amendment. *Dreyer* v. *Illinois*, 187 U. S. 71, 83, 84; *Michigan Cent. R. R. Co.* v. *Powers*, 201 U. S. 294; *Consolidated Railway Co.* v. *Vermont*, 207 U. S. 541; *Twining* v. *State of New Jersey*, 211 U. S. 78; *Walker* v. *Sauvinet*, 92 U. S. 90; *Maxwell* v. *Dow*, 176 U. S. 581; *Hurtado* v. *California*, 110 U. S. 516; *Davis* v. *Burke*, 179 U. S. 399; *Reetz* v. *Michigan*, 188 U. S. 505.

In the cases before circular No. 58, the determination of the Secretary of Commerce and Labor that the facts warranted the imposition of a penalty was arrived at with due process of law.

Although prior to the issuance of the circular no formal notice of any set hearing preliminary to the imposition of the penalty was given, the plaintiffs had ample opportunity for defense had they cared to make one. Their theory that they were entitled to a technical and formal proceeding, failing which they need make no effort to avail themselves of their other opportunities for defense, is untenable. *Buttfield* v. *Stranahan*, 192 U. S. 470, 497; *Auffmordt* v. *Hedden*, 137 U. S.

310, 323; *Origet* v. *Hedden*, 155 U. S. 228, 236; *Murray's Lessee* v. *Hoboken Land Co.*, 18 How. 272; *McMillen* v. *Anderson*, 95 U. S. 37; *Springer* v. *United States*, 102 U. S. 586; *Turpin* v. *Lemon*, 187 U. S. 51, 58.

The due process clause is not intended to require the Government to pursue proceedings of which the parties concerned never avail themselves and thereby reduce to empty formulas. The delay of fourteen days provided by circular No. 58 clearly constitutes an impairment of the public interests and is to be required only where that public disadvantage is balanced by some substantial advantage to the individual.

Nor need the notice be a formal, personal notice. It is sufficient if the party concerned is made aware of the proceedings, as by publication, *Lent* v. *Tillson*, 140 U. S. 316; *Happy* v. *Mosher*, 44 N. Y. 313, or by statute fixing the sessions. *Glidden* v. *Harrington*, 189 U. S. 255, 258.

In the cases after circular No. 58, the determination of the Secretary of Commerce and Labor that the facts warranted the imposition of a penalty was arrived at with due process of law; the regulations provided for fourteen days' notice. *Johnson* v. *Hunter*, 127 Fed. Rep. 219, 223; *Hanover National Bank* v. *Moyses*, 186 U. S. 181, 192; *Huling* v. *Kaw Valley Ry.*, 130 U. S. 559; *Bellingham Bay &c. Co.* v. *New Whatcom*, 172 U. S. 314, 318.

It was within the authority of the Secretary to issue circular No. 58. The entire arrangement was for the benefit of the plaintiffs. The collector had a right to hold the vessel until the proceedings had been completed and the fine imposed; he allowed it to go on condition that security for the payment of the fine was retained; and this permission was not only well within the implied power of his department, but was expressly covered by the powers granted by § 22 of the immigration law. The final imposition of the fine completed the Government's right to the money, if ever incomplete, and ratified its collection. *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Origet* v. *Hedden*, 155 U. S. 228; *Auffmordt* v. *Hedden* 137 U. S. 310,

323; *Ludloff* v. *United States,* 108 U. S. 176; *Thacher's Distilled Spirits,* 103 U. S. 679; *In re Kollock,* 165 U. S. 526; *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.,* 190 U. S. 301; *Dastervignes* v. *United States,* 122 Fed. Rep. 30; *Stratton* v. *Oceanic Steamship Co.,* 140 Fed. Rep. 829.

Congress had the power to make the payment of the penalty a condition of obtaining clearance. *Gibbons* v. *Ogden,* 9 Wheat. 1; *United States* v. *Brigantine William* (1808), Fed. Cas. No. 614; *Hendricks* v. *Gonzalez,* 67 Fed. Rep. 351; *Cunard Co.* v. *Stranahan,* 134 Fed. Rep. 318; 17 Op. Atty. Gen. 82.

An English precedent is contained in Statutes 6 and 7, William IV, c. 11, § 2.

MR. JUSTICE WHITE delivered the opinion of the court.

The steamship company sought the recovery of money paid to the collector of customs of the port of New York which was exacted by that official under an order of the Secretary of Commerce and Labor. The findings of the court, the case by stipulation having been tried without a jury, leave no doubt that the money was paid to the collector under protest, and involuntarily. We say this because the findings establish that the company was coerced by the certainty that if it did not pay the collector would refuse a clearance to its steamships plying between New York city and foreign ports at periodical and definite sailings, whose failure to depart on time would have caused not only grave public inconvenience from the non-fulfillment of mail contracts, but besides would have entailed upon the company the most serious pecuniary loss consequent on its failure to carry out many other contracts.

Both the Secretary and the collector were expressly authorized by law, the one to impose and the other to collect the exactions which were made. The only question, therefore, is whether the power conferred upon the named officials was consistent with the Constitution. The provision under which the officials acted is § 9 of the act of March 3, 1903, entitled, "An Act

to regulate the immigration of aliens into the United States."
c. 1012, 32 Stat. 1213. Light to guide in an analysis of the
contentions concerning the asserted repugnancy of the section
to the Constitution will be afforded by giving at once the
merest outline of some of the comprehensive provisions of the
act of which it forms a part.

The act excludes from admission into the United States,
among other classes, those afflicted "with loathsome or with
dangerous contagious diseases." § 2. It prohibits the im-
portation of persons for immoral purposes or of persons to
perform "labor or service of any kind, skilled or unskilled, by
previous solicitation or agreement." §§ 3 and 4. It imposes
the duty on the master of any vessel having on board alien
immigrants to deliver to the immigrant officer at the port of
arrival lists made at the port of embarkation. § 12. These
lists are required to be verified by the oath of the master of
the vessel taken before the immigrant officer at the port of
arrival, to the effect that the surgeon of the vessel who sails
therewith has physically and orally examined each alien, and
that from such examination by the surgeon and from his own
investigation the officer of the ship believes that no one of the
listed persons is disqualified by law from entering. This list is
also required to be verified by the affidavit of the surgeon, and
in case no surgeon sails with the ship it is required that the
owner of the vessel employ at the port of embarkation a com-
petent surgeon to make the examination. §§ 13 and 14. Upon
the arrival of a vessel in the United States, for the purpose of
verifying the lists, immigration officers are authorized to board
the vessel, inspect the immigrants and to disembark them
for further inspection and medical examination, the disem-
barkation for such purposes not to be considered as a landing
within the United States. The medical examination, the stat-
ute provides, shall be made by medical officers of the United
States Marine Hospital Service assigned to such duty, and
upon them is imposed the obligation of certifying, "for the
information of the immigration officers and the boards of spe-

cial inquiry provided for, any and all physical and mental de-
fects or diseases observed by said medical officers in any such
alien." In case of controversy concerning the right of an alien
to land, full provision is made for the taking of testimony, and
ultimately where a right to land is challenged, for a determin-
ation of the question by boards of inquiry which the statute
creates. §§ 16, 17, 24. The cost of maintenance pending in-
vestigation or treatment of an alien found to be within the
prohibited class or classes is cast upon the vessel and its owners,
and the duty of returning at its cost such immigrant to the
port from which he came is also cast upon the ship or its owner.
§ 19. The performance of the duties which the act imposes
are sanctioned in some cases by the creation of a criminal re-
sponsibility, and in others by the imposition of penalties recov-
erable in civil actions. Thus, among others, it is made a
misdemeanor, punishable by fine and imprisonment, for any
person to bring into or land, or attempt to do so, any alien not
duly admitted by an immigrant inspector or not lawfully
entitled to enter. § 6. It is made a misdemeanor, punishable
upon conviction by fine and imprisonment, to land any alien
without complying with the requirements for examination by
medical officers as contemplated in the statute. §§ 17 and 18.
And it is also made a misdemeanor, punishable by fine or im-
prisonment, to knowingly aid or assist or conspire to procure
or permit the entry of an alien into the United States contrary
to the regulations which the statute provides. § 38. Further,
it is made a misdemeanor to refuse to discharge the duty of
returning an immigrant and power is given to refuse clearance
to the vessel. § 19. And a penalty, recoverable by civil ac-
tion, is authorized for violations of § 4, relating to the impor-
tation of aliens under previous contract. Section 9, which as
we have said is here involved, is as follows:

"That it shall be unlawful for any person, including any
transportation company other than railway lines entering the
United States from foreign contiguous territory, or the owner,
master, agent, or consignee of any vessel, to bring to the

United States any alien afflicted with a loathsome or with a dangerous contagious disease; and if it shall appear to the satisfaction of the Secretary of the Treasury (Secretary of Commerce and Labor) that any alien so brought to the United States was afflicted with such a disease at the time of foreign embarkation, and that the existence of such disease might have been detected by means of a competent medical examination at such time, such person or transportation company, or the master, agent, owner, or consignee of any such vessel, shall pay to the collector of customs of the customs district in which the port of arrival is located the sum of one hundred dollars for each and every violation of the provisions of this section; and no vessel shall be granted clearance papers while any such fine imposed upon it remains unpaid, nor shall such fine be remitted."

The express prohibition against bringing into the United States alien immigrants afflicted with "loathsome or dangerous contagious diseases," which the section contains, is so apparent, and the power to enact the prohibition so obvious, that we dismiss these subjects from further consideration. The exaction which the section authorizes the Secretary of Commerce and Labor to impose, when considered in the light afforded by the context of the statute, is clearly but a power given as a sanction to the duty, which the statute places on the owners of all vessels, to subject all alien emigrants, prior to bringing them to the United States, to medical examination at the point of embarkation, so as to exclude those afflicted with the prohibited diseases. In other words, the power to impose the exaction which the statute confers on the Secretary is lodged in that officer only when it results from the official medical examination at the point of arrival not only that an alien is afflicted with one of the prohibited diseases, but that the stage of the malady as disclosed by the examination establishes that the alien was suffering with the disease at the time of embarkation, and that such fact would have been then discovered had the medical examination been then made by the vessel or its

owners, as the statute requires. We think it is also certain that the power thus lodged in the Secretary of Commerce and Labor was intended to be exclusive, and that its exertion was authorized as the result of the probative force attributed to the official medical examination for which the statute provides, and that the power to refuse clearance to vessels was lodged for the express purpose of causing both the imposition of the exaction and its collection to be acts of administrative competency, not requiring a resort to judicial power for their enforcement. While we have said that the conclusions just stated are clearly sustained by the text, yet, if ambiguity be conceded, it is dispelled, and the same result is reached by a consideration of the report of the Senate Committee on Immigration, where the provisions originated, and which we have a right to consider as a guide to its true interpretation. *The Delaware,* 161 U. S. 459; *Buttfield* v. *Stranahan,* 192 U. S. 470, 495. In that report it was said:

"Notwithstanding the explicit prohibition of the present law, it has been found impossible to prevent the steamship companies from bringing diseased aliens to our ports. Once on this side, every argument and influence that can be used is resorted to, either to effect the landing of such aliens or their treatment in the hospital as a preliminary to such landing. Expert medical testimony is secured to attack the diagnosis of the examining surgeon and even to question the contagious nature of the disease. Pitiable stories are told of the separation of parents from young children to induce officers to relax in the discharge of their plain duty. Great charitable organizations intervene, and even political influence is invoked for the same purpose, the steamship companies themselves, either covertly or openly, displaying a spirit of resistance to the law. If all of these obstacles to the execution of the law fail of their purpose, and the alien afflicted with tuberculosis, favus, or trachoma is sent back, still by the willful or indifferent defiance of this sanitary law the design sought by its passage is defeated, for hundreds may possibly have been—indeed,

almost certainly have been—exposed to the disease in the
steerage on the way over, may have been affected by it and
landed before it has reached a stage of development suffi-
ciently advanced to be detected by the medical inspector.

"Section 10 of the measure under consideration [which in
the final enactment became § 9 of the law] therefore imposes
a penalty of $100, to be imposed by the Secretary of the Treas-
ury (now Secretary of Commerce and Labor), for each case
brought to an American port, provided in his judgment the
disease might have been detected by means of medical exam-
ination at the port of embarkation. This sufficiently guards
the transportation lines from an unjust and hasty imposition
of the penalty, insures a careful observance of the law, and
leaves in their own hands the power to escape even a risk of
the fine being imposed, since they can refuse to take on board
even the most doubtful case until certified by competent med-
ical authority to be entirely cured." 57th Con. 1st sess. S.
Rept. No. 2119, p. viii; 57th Con. 2d sess. S. Doc. No. 62.

Resting, as the statute does, upon the authority of Congress
over foreign commerce and its right to control the coming
of aliens into the United States, and to regulate that subject
in the fullest degree, reserving for future consideration the
particular contentions advanced at bar by the plaintiff in
error, it may not be doubted that it is not open to discussion
that the statute as thus construed was within the power of
Congress to enact. In *Buttfield* v. *Stranahan*, 192 U. S. 470,
considering the subject, it was said (pp. 492, 493):

"Whatever difference of opinion, if any, may have existed
or does exist concerning the limitations of the power resulting
from other provisions of the Constitution, so far as interstate
commerce is concerned, it is not to be doubted that from the
beginning Congress has exercised a plenary power in respect
to the exclusion of merchandise brought from foreign coun-
tries; not alone directly by the enactment of embargo stat-
utes, but indirectly as a necessary result of provisions con-
tained in tariff legislation. It has also, in other than tariff

legislation, exerted a police power over foreign commerce by provisions which in and of themselves amounted to the assertion of the right to exclude merchandise at discretion

\*     \*     \*     \*     \*     \*     \*     \*

"As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations, which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised. This being true, it results that a statute which restrains the introduction of particular goods into the United States from considerations of public policy does not violate the due process clause of the Constitution."

In *Turner* v. *Williams*, 194 U. S. 279, in the course of an opinion considering the act here involved, and holding it valid in so far as it provided for the exclusion of anarchists, it was said (p. 289):

"Repeated decisions of this court have determined that Congress has the power to exclude aliens from the United States; to prescribe the terms and conditions on which they may come in; to establish regulations for sending out of the country such aliens as have entered in violation of law, and to commit the enforcement of such conditions and regulations to executive officers; that the deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law, and that the provisions of the Constitution securing the right of trial by jury have no application."

The whole subject was again reviewed in *United States* v. *Ju Toy*, 198 U. S. 253, where, in upholding the validity of the Chinese Exclusion Act, it was observed that the power of Congress to deal with the admission of aliens and to confide the enforcement of such laws to administrative officers was in view of the previous cases no longer open to discussion.

We come to consider the specific grounds which are relied-

upon to remove the case from the control of these general principles.

1. It is insisted that, however complete may be the power of Congress to legislate concerning the exclusion of aliens and to entrust the enforcement of legislation of that character to administrative officers, nevertheless the particular legislation here in question is repugnant to the Constitution because it defines a criminal offense and authorizes a purely administrative official to determine whether the defined crime has been committed, and, if so, to inflict punishment. Conclusive support for the legal proposition upon which this contention must rest, it is insisted, results from the ruling in *Wong Wing* v. *United States*, 163 U. S. 228, where it was said (p. 237):

"We regard it as settled by our previous decisions that the United States can, as a matter of public policy, by Congressional enactment, forbid aliens or classes of aliens from coming within their borders, and expel aliens or classes of aliens from their territory, and can, in order to make effectual such decree of exclusion or expulsion, devolve the power and duty of identifying and arresting the persons included in such decree, and causing their deportation, upon executive or subordinate officials.

"But when Congress sees fit to further promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, we think such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused. No limits can be put by the courts upon the power of Congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land and unlawfully remain therein. But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial.

It is not consistent with the theory of our Government that the legislature should, after having defined an offense as an infamous crime, find the fact of guilt and adjudge the punishment by one of its own agents."

But in so far as the case of Wong Wing held that the trial and punishment for an infamous offense was not an administrative but a judicial function, it is wholly inapposite to this case, since, on the face of the section which authorizes the Secretary of Commerce and Labor to impose the exaction which is complained of, it is apparent that it does not purport to define and punish an infamous crime, or indeed any criminal offense whatever. Clear as is this conclusion from the text of § 9, when considered alone, it becomes, if possible, clearer when the section is enlightened by an analysis of the context of the act and by a consideration of the report of the Senate committee to which we have previously made reference. We say by an analysis of the context of the act, because, as we have previously stated, its various sections accurately distinguish between those cases where it was intended that particular violations of the act should be considered as criminal and be punished accordingly, and those where it was contemplated that violations should not constitute crime, but merely entail the infliction of a penalty, enforcible in some cases by purely administrative action and in others by civil suit. We say also by a consideration of the report of the Senate committee, since that report leaves no doubt that the sole purpose of § 9 was to impose a penalty, based upon the medical examination for which the statute provided, thus tending, by the avoidance of controversy and delay, to secure the efficient performance by the steamship company of the duty to examine in the foreign country, before embarkation, and thereby aid in carrying out the policy of Congress to exclude from the United States aliens afflicted with loathsome or dangerous contagious diseases as defined in the act. The contention that because the exaction which the statute authorizes the Secretary of Commerce and Labor to impose is a penalty,

therefore its enforcement is necessarily governed by the rules controlling in the prosecution of criminal offenses, is clearly without merit, and is not open to discussion. *Hepner* v. *United States*, 213 U. S. 103.

2. But it is argued that even though it be conceded that Congress may in some cases impose penalties for the violation of a statutory duty and provide for their enforcement by civil suit instead of by criminal prosecution, as held in *Hepner* v. *United States*, nevertheless that doctrine does not warrant the conclusion that a penalty may be authorized, and its collection committed to an administrative officer without the necessity of resorting to the judicial power. In all cases of penalty or punishment, it is contended, enforcement must depend upon the exertion of judicial power, either by civil or criminal process, since the distinction between judicial and administrative functions cannot be preserved consistently with the recognition of an administrative power to enforce a penalty without resort to judicial authority. But the proposition magnifies the judicial to the detriment of all other departments of the Government, disregards many previous adjudications of this court and ignores practices often manifested and hitherto deemed to be free from any possible constitutional question.

Referring in *Bartlett* v. *Kane*, 16 How. 263, to the authority of Congress to confide to administrative officers the enforcement of tariff legislation, it was said (p. 272):

"The interference of the courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief; and we are satisfied that such a power was never intended to be given to them. *Decatur* v. *Paulding*, 14 Pet. 499."

And in the same case, in considering the nature and character of a penalty of ten per cent which the tariff act of 1842 (5 Stat. 563, chap. 270) authorized administrative officers to impose in cases of undervaluation, it was said (p. 274):

"An examination of the revenue laws upon the subject of levying additional duties, in consequence of the fact of an un-

dervaluation by the importer, shows that they were exacted as discouragements of fraud, and to prevent efforts by importers to escape the legal rates of duty. In several of the acts this additional duty has been distributed among officers of the customs upon the same conditions as penalties and forfeitures. As between the United States and the importer, . . . it must still be regarded in the light of a penal duty."

See also *Murray's Lessee et al.* v. *Hoboken Land & Improvement Co.*, 18 How. 272.

In *Passavant* v. *United States*, 148 U. S. 214, the authority of Congress to delegate to administrative officers final and conclusive authority as to the valuation of imported merchandise, accompanied with the power to impose a penalty for undervaluation, was reiterated, and the doctrine of *Bartlett* v. *Kane* was applied. And the same principle was upheld in *Origet* v. *Hedden*, 155 U. S. 228.

In accord with this settled judicial construction the legislation of Congress from the beginning, not only as to tariff but as to internal revenue, taxation and other subjects, has proceeded on the conception that it was within the competency of Congress, when legislating as to matters exclusively within its control, to impose appropriate obligations and sanction their enforcement by reasonable money penalties, giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power.

It is insisted that the decisions just stated and the legislative practices referred to are inapposite here, because they all relate to subjects peculiarly within the authority of the legislative department of the Government, and which, from the necessity of things, required the concession that administrative officers should have the authority to enforce designated penalties without resort to the courts. But over no conceivable subject is the legislative power of Congress more complete than it is over that with which the act we are now considering deals. If the proposition implies that the right of Congress to enact legislation is to be determined, not by the grant of power made

by the Constitution, but by considering the particular emergency which has caused Congress to exert a specified power, then the proposition is obviously without foundation. This is apparent, since the contention then would proceed upon the assumption that it is within the competency of judicial authority to control legislative action as to subjects over which there is complete legislative authority, on the theory that there was no necessity calling for the exertion of legislative power. As the authority of Congress over the right to bring aliens into the United States embraces every conceivable aspect of that subject, it must follow that if Congress has deemed it necessary to impose particular restrictions on the coming in of aliens, and to sanction such prohibitions by penalties enforcible by administrative authority, it follows that the constitutional right of Congress to enact such legislation is the sole measure by which its validity is to be determined by the courts. The suggestion that if this view be applied grave abuses may arise from the mistaken or wrongful exertion by the legislative department of its authority but intimates that if the legislative power be permitted its full sway within its constitutional sphere, harm and wrong will follow, and therefore it behooves the judiciary to apply a corrective by exceeding its own authority. But as was pointed out in *Cary* v. *Curtis*, 3 How. 236, and as has been often since emphasized by this court (*McCray* v. *United States*, 195 U. S. 27), the proposition but mistakenly assumes that the courts can alone be safely intrusted with power, and that hence it is their duty to unlawfully exercise prerogatives which they have no right to exert, upon the assumption that wrong must be done to prevent wrong being accomplished.

3. It is urged that the fines which constituted the exactions were repugnant to the Fifth Amendment, because amounting to a taking of property without due process of law, since, as asserted, the fines were imposed, in some cases, without any previous notice, and in all cases without any adequate notice or opportunity to defend. Stated in the briefest form, the

findings below show that on the arrival of a vessel, if the examining medical officers discovered that an immigrant was afflicted with one of the prohibited diseases, the owner of the vessel was notified of the fact, and, indeed, that the steamship company had at the place where the examination was made what is known as a landing agent, whose business it was to keep informed as to the result of medical examinations, and to know when an immigrant was detained by the medical officers because afflicted with a prohibited disease. The findings also established that where a fine was imposed under § 9 by the Secretary of Commerce and Labor it was only done after the transmission to that official of the certificate of the examining medical officer that a particular alien immigrant had been found to be afflicted with one of the prohibited diseases, and that the state of the disease established in the opinion of the medical officer that it existed at the time of embarkation, and could then have been detected by a competent medical examination. Prior to a certain date the action of the Secretary of Commerce and Labor imposing a fine was notified to the steamship company and demand of payment was practically at once made. After a certain date, by what is known as circular No. 58, the same process was followed as to the imposition of the fine, but a period of time—fourteen days—was allowed to intervene between the notice given of the imposition of the fine and its final and compulsory exaction. As to the action of the Secretary of Commerce and Labor before the promulgation of circular No. 58, the court below found that no adequate opportunity was afforded the vessel or its owner to be heard, and, as to the notice given after the promulgation of circular No. 58, it was found that the fourteen days allowed by that circular, and the practice under it, "did not afford the plaintiff a reasonable opportunity to obtain evidence from the port of embarkation and to be heard upon the question whether a fine should be imposed." Much contention is made in argument concerning these findings, it being insisted that there is conflict between them, and different views are taken as to

which of the findings should, under the circumstances of the case, be treated as dominant. But into that controversy we do not think it necessary to enter, since, as previously pointed out, it is evident that the statute unambiguously excludes the conception that the steamship company was entitled to be heard, in the sense of raising an issue and tendering evidence concerning the condition of the alien immigrant upon arrival at the point of disembarkation, as the plain purpose of the statute was to exclusively commit that subject to the medical officers for which the statute provided. We shall, therefore, test the soundness of the proposition we are considering upon that assumption.

In view of the absolute power of Congress over the right to bring aliens into the United States we think it may not be doubted that the act would be beyond all question constitutional if it forbade the introduction of aliens afflicted with contagious diseases, and, as a condition to the right to bring in aliens, imposed upon every vessel bringing them in, as a condition of the right to do so, a penalty for every alien brought to the United States afflicted with the prohibited disease, wholly without reference to when and where the disease originated. It must then follow that the provision contained in the statute is of course valid, since it only subjects the vessel to the exaction when, as the result of the medical examination for which the statute provides, it appears that the alien immigrant afflicted with the prohibited malady is in such a stage of the disease that it must in the opinion of the medical officer have existed and been susceptible of discovery at the point of embarkation. Indeed, it is not denied that there was full power in Congress to provide for the examination of the alien by medical officers and to attach conclusive effect to the result of that examination for the purposes of exclusion or deportation. But it is said the power to do so does not include the right to make the medical examination conclusive for the purpose of imposing a penalty upon the vessel for the negligent bringing in of an alien. We think the argument rests

upon a distinction without a difference. It disregards the purpose which, as we have already pointed out, Congress had in view in the enactment of the provision, that is, the guarding against the danger to arise from the wrongful taking on board of an alien afflicted with a contagious malady, not only to other immigrant passengers, but ultimately it might be to the entire people of the United States, a danger arising from the possible admission of aliens who might contract the contagion during the voyage and yet be entitled to admission because apparently not afflicted with the prohibited disease, owing to the fact that the time had not elapsed for the manifestation of its presence. In effect, all the contentions pressed in argument concerning the repugnancy of the statute to the due process clause really disregarded the complete and absolute power of Congress over the subject with which the statute deals. They mistakenly assume that mere form and not substance may be made by the courts the conclusive test as to the constitutional power of Congress to enact a statute. These conclusions are apparent, we think, since the plenary power of Congress as to the admission of aliens leaves no room for doubt as to its authority to impose the penalty, and its complete administrative control over the granting or refusal of a clearance also leaves no doubt of the right to endow administrative officers with discretion to refuse to perform the administrative act of granting a clearance as a means of enforcing the penalty which there was lawful authority to impose.

There are many other propositions urged in argument which we do not deem it necessary to specifically notice, as in effect they are all disposed of by the considerations which we have stated.

We have not considered the questions which would arise for decision if the case presented an attempt to endow administrative officers with the power to enforce a lawful exaction by methods which were not within the competency of administrative duties, because they required the exercise of judicial authority. *Affirmed.*