## NOLAN v. UNITED STATES.

### No. K–463.

Court of Claims.
June 2, 1930.

John Kennedy White, of New York City, for plaintiff.

Dan M. Jackson, of Washington, D. C., and Charles B. Rugg, Asst. Atty. Gen., for the United States.

BOOTH, Chief Justice, and LITTLETON, GREEN, and WILLIAMS, Judges.

### Motion to Dismiss.

WILLIAMS, Judge.

This matter comes up on defendant's motion to dismiss plaintiff's petition and the ground that the court is without authority to hear and adjudicate the case.

The petition alleges:

"That plaintiff is an attorney and counselor at law, duly admitted to practice in the courts of the State of New York, and having an office for the transaction of business in the city, county, and State of New York, and at the times hereinafter mentioned acted as the proctor in admiralty for the Black Star Line.

"That at all the times hereinafter mentioned the Black Star Line was a corporation organized and existing under the laws of the State of Delaware, and having an office for the transmission of business in the city, county, and State of New York, and engaged in the steamship business.

"That at the present time said Black Star Line is not functioning, is not engaged in business, and, as far as plaintiff is aware, or has been able to ascertain, has held no meetings of stockholders or directors, and is without any officers or directors to conduct business.

"That early in the year 1921 the Black Star Line, desiring to increase its tonnage, sought to procure an additional ship or ships and entered into a contract with one Rudolph Silverstone, doing business as the New York Ship Exchange. Various negotiations were had through the said Silverstone, to whom the Black Star Line had advanced certain sums of money for the purpose of acquiring a ship or ships, and said Silverstone had, as part of his employment for the Black Star Line, made a bid to the U. S. Shipping Board for the SS. Orion.

"That thereafter the Black Star Line consulted this plaintiff with respect to said matters, and advised plaintiff that the sum of $12,500.00 had been deposited with the U. S. Shipping Board as an earnest of the bid made for the SS. Orion, but that the said bid could not be accepted because the U. S. Shipping Board required an additional sum of $10,000.00 to be deposited, which sum of money the Black Star Line was not in a position to advance, and requested the plaintiff to loan and advance the sum of $10,000 and pay the same for account of the Black Star Line to the U. S. Shipping Board as additional earnest money on the bid of the Black Star Line for the SS. Orion.

"Plaintiff, after aiding the Black Star Line in an endeavor to raise the sum of $10,000.00, which efforts of the Black Star Line were unsuccessful, arranged a loan in the sum of $10,000.00 with the International Finance Corporation, which latter corporation insisted upon a corporation note in the sum of $11,000.00, secured by a surety company bond, for the purpose of the advancement of said sum of $10,000.00. Plaintiff then procured from the Black Star Line its promissory note in the sum of $11,000.00, which plaintiff indorsed, and also secured from the Massachusetts Bonding Company a bond guaranteeing the payment of the said $11,000.00, and plaintiff indemnified the Massachusetts Bonding Company for the execution of said bond.

"The International Finance Corporation then paid to plaintiff the sum of $10,000.00 and plaintiff then drew his check to the order of the U. S. Shipping Board, dated August 30th, 1921, and had the same certified, and said check was deposited with the U. S. Shipping Board as additional earnest money on the bid of the Black Star Line for the purchase of the SS. Orion.

"That thereafter the said promissory note of the International Finance Corporation became due, but the bid of the Black Star Line for the SS. Orion had not been acted upon by the U. S. Shipping Board, and plaintiff paid the additional sum of $1,000.00 to the International Finance Corporation for the renewal of the said note.

"That thereafter the U. S. Shipping Board refused the bid of the Black Star Line for the SS. Orion.

"That thereafter the said promissory note became due and payable, and the same was paid by the Massachusetts Bonding Company to the International Finance Corporation, and this plaintiff, in turn, under the indemnity agreement given to the Massachusetts Bonding Company, paid over to the said Massachusetts Bonding Company the sum of $11,818.47.

"That at the time plaintiff agreed with the Black Star Line to obtain the said sum of $10,000 and pay the same to the U. S. Shipping Board as additional earnest money on the bid of the Black Star Line for the SS. Orion, it was agreed between the Black Star Line and this plaintiff that if the bid of the Black Star Line to the U. S. Shipping Board for the SS. Orion was not accepted that the sum of $10,000.00, so advanced by this plaintiff would be returned to this plaintiff, and also all sums expended, or liabilities incurred, by plaintiff in connection therewith; and it was further agreed that if the U. S. Shipping Board did accept the bid of the Black Star Line for the SS. Orion that from the first freight moneys received by the Black Star Line for cargo laden, or to be laden, on board the SS. Orion there would be returned to this plaintiff the said sum of $10,-000.00, and also all sums expended, or liabilities incurred in connection therewith.

"That except for the foregoing agreement, providing for the method of the return of said $10,000.00 to this plaintiff no other security or collateral has at any time been received by the plaintiff.

"That the $10,000.00 obtained as above set forth from the International Finance Corporation, as well as the bond of the Massachusetts Bonding Company, guaranteeing payment of the said loan, were made solely upon the credit and responsibility of this plaintiff, and on his application, and as a personal matter to this plaintiff, wholly separate and apart from the Black Star Line or any of its officers.

"That thereafter demand was made upon the U. S. Shipping Board for the return of the said sum of $10,000.00, as well as the return of the said sum of $12,500.00, representing the total earnest money deposited with the U. S. Shipping Board, but the U. S. Shipping Board failed and refused to pay the said sum of $12,500.00 to the Black Star Line, but first deducted its expenses in connection with the said bid of the Black Star Line for the SS. Orion, and then, over the objection of this plaintiff covered the said sum of $10,000.00 into the Treasury of the United States, and over the objection of the representatives of the Black Star Line covered the said $12,500.00, less the expenses of the U. S. Shipping Board in connection with the said bid for the SS. Orion, into the Treasury of the United States.

"That the plaintiff is justly entitled to said sum of $10,000.00 actually advanced to the U. S. Shipping Board by plaintiff for account of the Black Star Line, as well as for the sum of $1,818.47, the amount paid over and above the sum of $10,000.00 in liquidation of the said promissory note, and in addition thereto the sum of $1,000.00 advanced by plaintiff on behalf of the Black Star Line to the International Finance Corporation for the renewal of the said obligation.

"That this suit is brought under authority of the act of Congress approved March 1st, 1929, being private bill No. 459—70th Congress (Senate bill No. 229 [45 Stat. c. 471]), entitled:

" 'An act for the relief of certain seamen and any and all persons entitled to receive a part or all of money now held by the Government of the United States on a purchase contract of steamship Orion who are judgment creditors of the Black Star Line (Incorporated) for wages earned';" and under section 145 of the Judicial Code (28 USCA § 250).

"That the plaintiff is the sole owner of this claim, and has made no assignment or transfer thereof, or of any part thereof, or interest therein; that the plaintiff is justly entitled to the amount herein claimed from the United States, after allowing all just credits and offsets; that the plaintiff has at all times borne true allegiance to the Government of the United States, and has not in any way voluntarily aided, abetted, or given encouragement to any revolution against the Government of the United States."

The title of the act clearly and definitely designates the persons for whose relief the special act of Congress was intended—"certain seamen and any and all persons entitled * * * who are judgment creditors of the Black Star Line (Incorporated) for wages earned."

The plaintiff is not a seaman and he is not a judgment creditor of the Black Star Line, Inc., for "wages earned," consequently he is clearly excluded from the benefits of the act.

The plaintiff urges that there is no rule of law holding that the title of an act of Con-

gress excludes from the benefits of such act others who are not specifically mentioned in the title of the act. That is true, but it is also true that the courts give to the title of acts due consideration in the construction of statutes.

Chief Justice Marshall, in United States v. Fisher, 2 Cranch, 358, 386, 2 L. Ed. 304, said: "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration."

In United States v. Palmer, 3 Wheat. 610, 631, 4 L. Ed. 471, the Supreme Court, speaking again through Chief Justice Marshall, said: "The title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature."

In Holy Trinity Church v. United States, 143 U. S. 457, 12 S. Ct. 511, 513, 36 L. Ed. 226, the court said: "It will be seen that words as general as those used in the first section of this act were by that decision limited, and the intent of congress with respect to the act was gathered partially, at least, from its title. Now, the title of this act is, 'An act to prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States, its territories, and the District of Columbia.' Obviously the thought expressed in this reaches only to the work of the manual laborer, as distinguished from that of the professional man. No one reading such a title would suppose that congress had in its mind any purpose of staying the coming into this country of ministers of the gospel, or, indeed, of any class whose toil is that of the brain. The common understanding of the terms 'labor' and 'laborers' does not include preaching and preachers; and it is to be assumed that words and phrases are used in their ordinary meaning. So whatever of light is thrown upon the statute by the language of the title indicates an exclusion from its penal provisions of all contracts for the employment of ministers, rectors, and pastors."

That the plaintiff is not included among those whose relief Congress had in mind is conclusively shown by the report made by the committee of the Senate having the bill in charge:

"The claimants are judgment creditors of the Black Star Line (Inc.), a Delaware corporation, which maintains an office for the transaction of business in the State of New York. The claimants were sailors on a ship known as the Kanawah. Most of them were common seamen who secured their judgments in an action brought in their behalf in the District Court of the United States for the Southern District of New York on December 16, 1921. The judgment amounted to $12,303.35. The applicant, Garrett, was the engineer on the said vessel, whose claim for services covered a long period of time while protecting the vessel in foreign waters. This judgment was obtained on the 28th day of January, 1925, in the Supreme Court of the State of New York, New York County, and amounts to $5,836.64 with interest. * * *

"It has been suggested that because certain agents of the Black Star Line (Inc.), which actually forwarded the money to the Shipping Board on behalf of the Black Star Line (Inc.), should be considered in connection with the application of these funds. Such a position can not in any way be considered seriously. The New York Ship Exchange which forwarded the money, did so, as the correspondence shows, unequivocally as the agent of the Black Star Line (Inc.). Whether it sent its own check or the check of the Black Star Line (Inc.) was a matter absolutely immaterial. There was no claim that it was sending its own money and there is nothing whatever in the correspondence which would justify any possible inference that it was not the money of the Black Star Line (Inc.). There is nothing even which could suggest either in this instance or in the case of Nolan that the money was even being loaned to the Black Star Line by the forwarders, but even if the money were being loaned it belonged to the Black Star Line (Inc.), once the loan had been made and the lenders could not look to that fund for reimbursement, but would have a general claim against the borrower. But there is nothing in the case whatever to justify even a belief that there was any loan of these moneys."

Reports of committees of Congress made at the time a bill is reported from a committee to the Congress for consideration are treated by the courts as having great and generally controlling weight in the construction of statutes enacted on the strength of such reports.

In Binns v. United States, 194 U. S. 486, 495, 24 S. Ct. 816, 819, 48 L. Ed. 1087, the Supreme Court said: "We have examined the reports of the committees of either body with a view of determining the scope of statutes passed on the strength of such reports."

In McLean v. United States, 226 U. S. 374, 380, 33 S. Ct. 122, 124, 57 L. Ed. 260, under

a special act referring the claim to this court, the court said: "She asserts that the prompting of the act was to repair an injustice done to Major McLean, and, to support the assertion, she refers to the reports of the committees of the House of Representatives and that of the Senate, Fifty-third Congress. The reference is justified (Oceanic Steam Navigation Co. v. Stranahan, 214 U. S. 320, 333, 29 S. Ct. 671, 53 L. Ed. 1013, 1019; Northern Pacific Co. v. Washington, 222 U. S. 370, 380, 32 S. Ct. 160, 56 L. Ed. 237, 240) and gives support to the contention that the circumstances which preceded and provoked Major McLean's resignation appealed to Congress, and to redress its consequences Congress authorized his reinstatement, and, to make it complete, passed the act of February 24, 1905."

In Duplex Co. v. Deering, 254 U. S. 443, 474, 475, 41 S. Ct. 172, 179, 65 L. Ed. 349, 16 A. L. R. 196, this rule was reaffirmed and extended: "Reports of committees of House or Senate stand upon a more solid footing, and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure. Binns v. United States, 194 U. S. 486, 495, 24 S. Ct. 816, 48 L. Ed. 1087. And this has been extended to include explanatory statements in the nature of a supplemental report made by the committee member in charge of a bill in course of passage."

It is manifest from the title of the act, from the committee reports in Congress when the act was under consideration, and from the language of the act itself, that the plaintiff is excluded from the provisions of the act and cannot maintain his suit in this court.

The motion to dismiss is therefore allowed. The petition is dismissed. It is so ordered.