**DUKICH v. BLAIR, Internal Revenue Com'r, et al.**

(District Court, E. D. Washington, N. D. January 19, 1925.)

No. 4240.

1. **Internal revenue ⬅═45—Taxes on illegal manufacture of liquor held penalty.**

Tax imposed on illegal manufacture of liquor by National Prohibition Act, tit. 2, § 35 (Comp. St. Ann. Supp. 1923, § 10138½v), is not in fact a tax, but a penalty for the execution of which evidence of violation of title 2, § 29 (section 10138½p), is a condition precedent, notwithstanding Willis-Campbell Act, § 5 (Comp. St. Ann. Supp. 1923, § 10138⅘c), providing that such taxes and penalties shall be assessed and collected in same manner as other liquor taxes.

2. **Constitutional law ⬅═318—Administrative proceedings as due process dependent on authority of Congress to confer power exercised.**

For hearing and decision by administrative body to constitute due process of law, the powers lodged in the administrative officers must be within authority of Congress to confer.

3. **Constitutional law ⬅═251—"Due process" defined.**

"Due process" of law in each particular case means such exertion of government power as settled maxims of law permit and sanction, and under such safeguards for protection of individual rights as those maxims prescribe

for the class of cases to which the one being dealt with belongs.

[Ed Note.—For other definitions, see Words and Phrases, First and Second Series, Due Process of Law.]

**4. Constitutional law ☞283—Due process in taxation cases does not require judicial procedure.**

Due process of law in taxation is that procedure which is due and appropriate to that class of cases, as demonstrated by our experience in the enjoyment of self-government, and does not require judicial procedure.

**5. Constitutional law ☞318—Jury ☞19(17) —Enforcement of taxes under National Prohibition Act by administrative proceedings held violation of due process clause and denial of trial by jury.**

Administrative enforcement of the so-called taxes imposed by National Prohibition Act, tit. 2, § 35 (Comp. St. Ann. Supp. 1923, § 10138½v), for the illegal manufacture of liquor by assessment and distraint proceedings against property, under Willis-Campbell Act, § 5 (Comp. St. Ann. Supp. 1923, § 10138⅘c), is violative of due process and denies the right of trial by jury guaranteed by Const. Amend. 6.

In Equity. Bill by Joe Dukich against David H. Blair, Commissioner of Internal Revenue, and another, to enjoin the collection of taxes assessed under the National Prohibition Act. Temporary injunction made permanent.

E. W. Robertson, of Spokane, Wash., for plaintiff.

Frank R. Jeffrey, U. S. Atty., and H. Sylvester Garvin, Asst. U. S. Atty., both of Spokane, Wash., and Ward Bonsall, Sp. Atty., of Washington, D. C., for defendants.

WEBSTER, District Judge. This is a bill in equity to enjoin the defendants Blair and Poe, as Commissioner of Internal Revenue and collector of internal revenue for the District of Washington, respectively, from proceeding to collect as against the complainant a so-called "tax" provided for by section 35 of title 2 of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138½v), upon the ground that the portion of that section authorizing the imposition of a "tax" is unconstitutional and void, in that it is violative of the guaranties of due process of law and of the right of trial by jury. The case is submitted on the pleadings, the controlling facts not being in dispute. The defendants admit the assessment of the tax, and that they will, unless restrained, proceed to its collection; while the complainant concedes that prior to the assessment he was notified by the defendants and offered an opportunity to appear and be heard, which he declined. It is obvious,

therefore, that this litigation cannot be disposed of without passing upon the constitutional question presented.

The pertinent provisions of section 35 read: "No liquor revenue stamps or tax receipts for any illegal manufacture or sale shall be issued in advance, but upon evidence of such illegal manufacture or sale a tax shall be assessed against, and collected from, the person responsible for such illegal manufacture or sale in double the amount now provided by law, with an additional penalty of $500 on retail dealers and $1,000 on manufacturers. The payment of such tax or penalty shall give no right to engage in the manufacture or sale of such liquor, or relieve anyone from criminal liability, nor shall this Act relieve any person from any liability, civil or criminal, heretofore or hereafter incurred under existing laws."

[1] In view of what I shall say later on, and as conducive to a clearer understanding of the important and delicate question presented for decision, I shall here pause and briefly analyze the section.

(1) It will be noted that the imposition provided for is called a "tax." It is plain, however, that it is not such, but is in fact and in law a penalty; that is to say, an imposition or an exaction laid for the purpose of punishing an infraction of a penal statute. It has been expressly so held by the Supreme Court of the United States: "The mere use of the word 'tax,' in an act primarily designed to define and suppress crime, is not enough to show that within the true intendment of the term a tax was laid. Child Labor Tax Case, ante, 20. * * * When by its very nature the imposition is a penalty, it must be so regarded. Helwig v. United States, 188 U. S. 605, 613. * * * It lacks all the ordinary characteristics of a tax, whose primary function 'is to provide for the support of the government,' and clearly involves the idea of punishment for infraction of the law—the definite function of a penalty. O'Sullivan v. Felix, 233 U. S. 318, 324." Lipke v. Lederer, 259 U. S. 557, 561, 42 S. Ct. 549, 551 (66 L. Ed. 1061). See, also, Regal Drug Co. v. Wardell, 260 U. S. 386, 391, 43 S. Ct. 152, 67 L. Ed. 318.

(2) Evidence of crime—the violation of section 29 of title 2 of the act (Comp. St. Ann. Supp. 1923, § 10138½p), either by manufacturing or selling intoxicating liquor in violation of the act—is a condition precedent and essential to the imposition of the penalty prescribed. Lipke v. Lederer, supra; Regal Drug Co. v. Wardell, supra.

(3) No particular character of evidence of

guilt is prescribed, nor is the quantum of proof necessary to establish guilt stated, and prior conviction of crime in a court of justice is not required. The section merely provides, "Upon evidence of such illegal manufacture or sale a tax shall be assessed," which clearly involves the exercise of a function inherently judicial.

(4) The exaction is laid, not upon liquor, but upon the illegal manufacture or sale of liquor.

(5) The penalty is not imposed as a mere incident to the regulation of a continuing business or activity within the power of Congress to regulate or control. The section contemplates only the commission of the crime of illegally manufacturing or selling intoxicating liquor in violation of the act as the sole prerequisite to the infliction of the punishment, and expressly provides that "the payment of such a penalty shall give no right to engage in the manufacture or sale of such liquor."

(6) While, as pointed out in the Lipke Case, the section prescribes no definite method for imposing the penalty which it directs, this omission has been supplied by section 5 of the Willis-Campbell Act (Comp. St. Ann. Supp. 1923, § 10138⅘c), which provides: "All taxes and tax penalties provided for in section 35 of title II of the National Prohibition Act shall be assessed and collected in the same manner and by the same procedure as other taxes on the manufacture of or traffic in liquor." Thus, it will be seen, this statute undertakes to confer the power or jurisdiction to assess and collect the prescribed penalties on administrative officers, and the procedure to be employed is to be the same as in the case of other taxes on the manufacture of or traffic in liquor, including the power of distraint.

(7) The penalty prescribed is not imposed as an incident to a tax, properly so-called, for the purpose of insuring promptness on the part of the taxpayer.

And, finally, the section is found in a highly penal statute, which is in no sense a revenue measure. Fontenot v. Accardo (C. C. A.) 278 F. 871.

It is insisted by learned counsel for the defendants that constitutional warrant for the enactment of the section, as supplemented by the Willis-Campbell Act, is found in section 2 of the Eighteenth Amendment, which reads, "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation;" that when acting in a field within its constitutional power Congress may commit to administrative officers the imposition and collection of money penalties, so long as the manner of doing so is not contrary to any provision in the Constitution and does not infringe any rights guaranteed by the Constitution; that no provision of the Constitution requires or guarantees trial by jury in the imposition of the penalties provided by section 35; that "due process of law," as guaranteed by the Constitution, does not require a jury trial, but means in this matter mere notice and opportunity to be heard before liability to pay the penalty is ascertained and decreed by the administrative officers in whom the power in the premises is lodged; that the regulations promulgated by the Bureau of Internal Revenue fully provide for such notice and hearing, and that these regulations were fully observed in this case.

[2] It is settled law that in many instances, such as the levying and collecting of taxes, properly so called, the regulation of immigration, the regulation of interstate or foreign commerce, and the like, it frequently happens that administrative officials, boards, or commissions are clothed with power to make decisions of questions which, if the lawmaking body had seen fit, might have been made the subject of formal actions in courts of justice, and, if an adequate opportunity is afforded to appear and be heard in advance of decision, due process of law is not thereby denied. But before such administrative action can be sustained as legal, however, the powers lodged in the administrative officers must be such as it is competent for the legislation to confer upon them.

[3, 4] What amounts to due process of law in one class of cases may amount to a denial of such process in another class. "Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights, as those maxims prescribe *for the class of cases to which the one being dealt with belongs."* Story on the Constitution (5th Ed.) § 1945.

Cases dealing with the assessment and collection of taxes—that is to say, impositions levied for the support of the government—have no application here; for, as I have already observed, the imposition authorized by section 35 is not a tax, and the reasons for the rule of due process of law in respect of taxes are wholly lacking in such a case as the one now under consideration. Due process of law in taxation is that which is due

and appropriate in that class of cases, as demonstrated by our experience in the enjoyment of self-government. Governments must have their revenues promptly and at the appointed time in order to discharge their functions. They cannot await the slow and tedious processes of judicial trials in their ordinary course. They must from sheer necessity proceed in the collection of the public revenues in a summary and more direct way. Hence it is uniformly held that due process of law in taxation does not require judicial procedure. "It may be added that probably there are few governments which do or can permit their claims for public taxes, either on the citizen or the officer employed for their collection or disbursement, to become subjects of judicial controversy, according to the course of the law of the land. Imperative necessity has forced a distinction between such claims and all others, which has sometimes been carried out by summary methods of proceeding, and sometimes by systems of fines and penalties, but always in some way observed and yielded to." Mr. Justice Curtis in Murray v. Hoboken Land Co., 59 U. S. (18 How.) 272, 15 L. Ed. 372.

The nation from which we inherited the phrase "due process of law" has never relied upon courts of justice for the collection of her public revenues. "Taxes have not, as a general rule, in this country since its independence, nor in England before that time, been collected by regular judicial proceedings. The necessities of government, the nature of the duty to be performed, and the customary usages of the people, have established a different procedure, which, in regard to that matter, is, and always has been, due process of law." Kelly v. Pittsburgh, 104 U. S. 78, 80 (26 L. Ed. 658).

[5] In the case at bar the element of public policy arising out of the necessity of the government to have its revenues promptly and without delay is wholly lacking. The government does not depend upon nor look to moneys collected as fines or penalties for violation of criminal statutes for revenue with which to perform its governmental functions or to carry on its public activities. Neither do the settled usages or methods of proceeding existing in the common or statute law of England, prior to the emigration of our ancestors, lend any support to the establishment of summary administrative procedure for the infliction of punishment for the violation of penal laws. Whoever heard of penalties imposed as punishment

3 F.(2d)—20

for crime being collected or enforced by distraint proceedings?

Such a method is neither suitable nor appropriate to the nature of such a case, and is clearly not sanctioned by established usages or customs, either in this or in the mother country. On the contrary, Magna Charta provides: "No freeman shall be taken or imprisoned, or disseized, or outlawed, or in any other manner injured, nor shall we proceed against him unless by the judgment of his peers or by the law of the land."

In Murray v. Hoboken Land Co., supra, this language is found: "The Constitution contains no description of those processes which it [due process of law] was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. *It is manifest that it was not left to the legislative power to enact any process which might be devised.* The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave Congress free to make any process 'due process of law,' by its mere will. To what principles, then, are we to resort to ascertain whether this process, enacted by Congress, is due process? To this the answer must be twofold. We must examine the Constitution itself, to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country."

I do not believe a case can be found in the books, decided by any court administering the common law, or administering a jurisprudence founded on the common law, which holds that punishment for crime may be inflicted or imposed in any other manner than by orderly trial in a court of justice of competent jurisdiction. Counsel for the defendants cite and place their chief reliance on the case of Oceanic Steam Navigation Co. v. Stranahan, 214 U. S. 320, 29 S. Ct. 671, 53 L. Ed. 1013. But in my opinion that case is distinguishable from the one in hand, though I confess it goes farther in upholding the exercise of administrative powers than any other case to which my attention has been directed.

The Immigration Act of March 3, 1903 (32 Stat. 1213), prohibited the bringing in

of any alien afflicted with a loathsome or dangerous contagious disease, and section 9 of the act provided: "That it shall be unlawful for any person, including any transportation company other than railway lines entering the United States from foreign contiguous territory, or the owner, master, agent, or consignee of any vessel to bring to the United States any alien afflicted with a loathsome or with a dangerous contagious disease; and if it shall appear to the satisfaction of the Secretary of Treasury that any alien so brought to the United States was afflicted with such a disease at the time of foreign embarkation, and that the existence of such disease might have been detected by means of a competent medical examination at such time, such person or transportation company or the master, agent, owner, or consignee of any such vessel shall pay to the collector of customs of the customs district in which the port of arrival is located the sum of one hundred dollars for each and every violation of the provisions of this section; and no vessel shall be granted clearance papers while any such fine imposed upon it remains unpaid, nor shall such fine be remitted."

The statute also provided that the certificate of the medical examiner should be conclusive proof of the facts therein certified. The statute made it a misdemeanor punishable by fine and imprisonment to bring into this country any alien not lawfully entitled to enter, but no crime was defined arising out of the failure to have the medical examination made abroad before permitting the alien to embark for the United States—that matter being dealt with exclusively by section 9 of the act. It was not essential, therefore, under section 9, that proof of any crime be made as a condition precedent to the laying of the exaction which the section prescribed. The court, after reviewing a number of authorities, redeclared the law as laid down in United States v. Ju Toy, 198 U. S. 253, 25 S. Ct. 644, 49 L. Ed. 1040, wherein it was said that the power of Congress to deal with the admission of aliens and to confide the enforcement of such laws to administrative officers was, in view of the previous cases, no longer open to discussion.

The court rested the constitutionality of section 9, there under review, upon the absolute authority of Congress over foreign commerce and the power to control the coming of aliens to the United States and to regulate those subjects in the fullest possible degree. In the course of the opinion, Mr. Justice White writing, it is said: "The exaction which the section [Section 9] authorizes the Secretary of Commerce and Labor to impose, when considered in the light afforded by the context of the statute, is clearly but a power given as a sanction to the duty, which the statute places on the owners of all vessels, to subject all alien emigrants, prior to bringing them to the United States, to medical examination at the point of embarkation, so as to exclude those afflicted with the prohibited diseases. * * * We think it is also certain that the power thus lodged in the Secretary of Commerce and Labor was intended to be exclusive, and that its exertion was authorized as the result of the probative force attributed to the official medical examination for which the statute provides, and that the power to refuse clearance to vessels was lodged *for the express purpose of causing both the imposition of the exaction and its collection to be acts of administrative competency, not requiring a resort to judicial power for their enforcement."*

Again in the opinion it is said: "In view of the absolute power of Congress over the right to bring aliens into the United States we think it may not be doubted that the act would be beyond all question constitutional if it forbade the introduction of aliens afflicted with contagious diseases, and, as a condition to the right to bring in aliens, imposed upon every vessel bringing them in, as a condition of the right to do so, a penalty for every alien brought to the United States afflicted with the prohibited disease, wholly without reference to when and where the disease originated. It must then follow that the provision contained in the statute is of course valid, since it only subjects the vessel to the exaction when, as the result of the medical examination for which the statute provides, it appears that the alien immigrant afflicted with the prohibited malady is in such a stage of the disease that it must in the opinion of the medical officer have existed and been susceptible of discovery at the point of embarkation."

Counsel for appellant in the case insisted that however complete may be the power of Congress to legislate concerning the exclusion of aliens and to entrust the enforcement of such legislation to administrative officers, nevertheless the legislation there involved was repugnant to the Constitution because it defined a criminal offense and authorized a purely administrative officer to determine whether the crime had been committed, and if so, to inflict punishment. In support of this contention the case of Wong Wing v.

United States, 163 U. S. 228, 16 S. Ct. 977, 41 L. Ed. 140, was cited and relied on. In that case it was said:

"We regard it as settled by our previous decisions that the United States can, as a matter of public policy, by congressional enactment, forbid aliens or classes of aliens from coming within their borders, and expel aliens or classes of aliens from their territory, and can, in order to make effectual such decree of exclusion or expulsion, devolve the power and duty of identifying and arresting the persons included in such decree, and causing their deportation upon executive or subordinate officials. But when Congress sees fit to further promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, we think such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused. No limits can be put by the courts upon the power of Congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land and unlawfully remain therein. But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial. It is not consistent with the theory of our government that the legislature should, after having defined an offense as an infamous crime, find the fact of guilt and adjudge the punishment by one of its own agents."

It will be observed that, while the offense there involved was an infamous crime, and some stress was laid in the opinion upon the right of the accused not to be proceeded against unless by presentment or indictment of a grand jury, yet judicial trial for *the determination of the fact of guilt* was also necessary, the court said, in order to make the enactment square with the Constitution. That the court intended by the language employed to so hold is fortified by the concurring part of the separate opinion of Mr. Justice Field. In the first paragraph of his opinion that great jurist said: "The majority of the justices, in this case, hold that whatever might be true as to the power of the United States to exclude aliens, yet there was no power to punish such aliens who had been permitted to become residents, and that, if such power did exist, it could only be lawfully exercised *after a judicial trial*, and therefore that the accused were entitled to be discharged from their arrest and imprisonment. To that extent their opinion is concurred in."

Surely the guaranty of the right of presentment or indictment by grand jury in case of capital or other infamous crimes is no more sacred than is the guaranty of speedy public trial by an impartial petit jury in all prosecutions for crime. Answering the contention of counsel in the Stranahan Case, the court said, and herein lies the fundamental point of distinction: "But in so far as the case of Wong Wing held that the trial and punishment for an infamous offense was not an administrative but a judicial function, it is wholly inapposite to this case, since, on the face of the section which authorizes the Secretary of Commerce and Labor to impose the exaction which is complained of, *it is apparent that it does not purport to define and punish an infamous crime, or indeed any criminal offense whatever.* Clear as is this conclusion from the text of section 9, when considered alone, it becomes, if possible, clearer when the section is enlightened by an analysis of the context of the act and by a consideration of the report of the Senate committee to which we have previously made reference. We say by an analysis of the context of the act, because, as we have previously stated, its various sections accurately distinguish between those cases where it was intended that particular violations of the act should be considered as criminal and be punished accordingly, and those where it was contemplated that violations should not constitute crime, but merely entail the infliction of a penalty, enforceable in some cases by purely administrative action and in others by civil suit."

I have quoted thus at length from the Stranahan Case for the purpose of showing that in that case no criminal act was involved, and proof of crime was not essential as a prerequisite to the laying of the exaction prescribed—the decision being rested solely upon the absolute power of Congress to regulate immigration and upon the settled law as to what is suitable and appropriate as constituting "due process of law" in that class of cases. In the light of the distinction to which I have adverted, it seems plain to me that the Stranahan Case is not applicable to this case, but that the principles announced in the Wong Wing Case are applicable; for here the infliction of the penalty necessitates the proof of crime, and the Sixth Amendment, guaran-

teeing speedy public trial by an impartial jury, relates to prosecutions for crime. The court in the Stranahan Case, in the concluding paragraph of the opinion, took pains to say: "We have not considered the questions which would arise for decision if the case presented an attempt to endow administrative officers with the power to enforce a lawful exaction by methods which were not within the competency of administrative duties, because they required the exercise of judicial authority."

Let it not be overlooked that as a general rule the phrases "due process of law" and "the law of the.land," which are synonymous, imply and include a regular course of judicial procedure, and cases where this is not so are the exception rather than the rule. As said by Daniel Webster in his famous argument in the Dartmouth College Case: "By the law of the land is most clearly intended the general law, a law which hears before it condemns, which proceeds upon inquiry and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not therefore to be considered the law of the land."

Returning again to the profound opinion in Murray v. Hoboken Land Co. we find this language: "For, though 'due process of law' generally implies and includes actor, reus, judex, regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, * * * yet, this is not universally true. There may be, and we have seen that there are cases, under the law of England after Magna Charta, and as it was brought to this country and acted on here, in which process, in its nature final, issues against the body, lands, and goods of certain public debtors without any such trial."

In view of the analysis of section 35, as supplemented by section 5 of the Willis-Campbell Act, already made, it seems too clear for serious debate that a legislative attempt has been made to lodge in an administrative official the power to receive evidence to establish the commission of crime, and, in the event guilt is proven to his satisfaction, to inflict upon the culprit, solely as a matter of punishment, the definite penalty prescribed, and to collect the amount of the fine imposed by distraint as for taxes, in the true meaning of the term. In my opinion, such legislation is beyond the sphere of constitu-

tional enactment. It is repugnant to and violative of the guaranties of both due process of law and the right of trial by jury. It is inconsistent with the genius of our government and is wholly out of harmony with the spirit of our institutions. It smacks of the Star Chamber, and cannot be permitted to stand.

This view, I believe, finds strong support in the language used in Lipke v. Lederer, supra. In that case it is said: "The collector demanded payment of a penalty, and section 3224, which prohibits suits to restrain assessment or collection of any tax, is without application. And the same is true as to statutes granting the right to sue for taxes paid under protest. A revenue officer without notice has undertaken to assess a penalty for an alleged criminal act and threatens to enforce payment by seizure and sale of property without opportunity for a hearing of any kind. Section 35 prescribes no definite mode for enforcing the imposition which it directs, and, if it be interpreted as above stated, we do not understand counsel for the United States claim that relief should be denied to the appellant. Before collection of taxes levied by statutes enacted in plain pursuance of the taxing power can be enforced, the taxpayer must be given fair opportunity for hearing; this is essential to due process of law. Central of Ga. Ry. v. Wright, 207 U. S. 127, 136, 138, 142, 28 Sup. Ct. 47, 52 L. Ed. 134, 12 Ann. Cas. 463. And certainly we cannot conclude, in the absence of language admitting of no other construction, that Congress intended that penalties for crime should be enforced through the secret findings and summary action of executive officers. The guaranties of due process of law and trial by jury are not to be forgotten or disregarded."

In the still later case of Regal Drug Co. v. Wardell, supra, wherein the principles of the Lipke Case were restated and reaffirmed, Mr. Justice McKenna says: "Passing on section 3244 of the Revised Statutes, which was urged against the suit, it was decided that the section had no application, and that section 35 of the Prohibition Act did not confer the power the collector threatened to exercise. Describing the power, we said, that the collector was undertaking to punish Lipke 'by fine and penalty for an alleged criminal offense without hearing, information, indictment or trial by jury, contrary to the federal Constitution.' And we said further that, if the 'section has the meaning ascribed to it by the defendant [the collector], it is unconstitutional.' The distinction between a

tax and a penalty was emphasized. The function of a tax, it was said 'is to provide for the support of the government,' the function of a penalty clearly involves the 'idea of punishment for infraction of the law,' and that a condition of its imposition is notice and hearing. O'Sullivan v. Felix, 233 U. S. 318, 324. And even if the imposition may be considered a tax, if it have punitive purpose, it must be preceded by opportunity to contest its validity. Central of Georgia Ry. Co. v. Wright, 207 U. S. 127. We took pains to say that 'evidence of crime (section 29) is essential to assessment under section 35,' and that we could not 'conclude, in the absence of language admitting of no other construction, that Congress intended that penalties for crime should be enforced through the secret findings and summary action of executive officers. The guarantees of due process of law and trial by jury are not to be forgotten or disregarded.'"

No law is ever enforced by law violation, and however important the enforcement of the National Prohibition Act may be admitted to be, means of such accomplishment must be found within the four corners of the Constitution of the United States—the great charter of American liberty. I am not unmindful of the overwhelming responsibility involved in declaring an act of Congress unconstitutional, especially when such action is invoked at the hands of a court of first instance, but in view of my fixed convictions in the premises there is no alternative consistent with my oath of office and the discharge of my public duty. I find comfort in the thought, however, that it is the imperative duty of all courts to be ever vigilant of the constitutional rights of the citizen.

The temporary injunction heretofore granted will be made permanent. Decree accordingly.