# Seventh Amendment Implications of Providing for the Administrative Adjudication of Claims Under Title VIII of the Civil Rights Act of 1968

Congress may, consistent with the Seventh Amendment and Article III of the Constitution, assign adjudication of certain violations of the Fair Housing Act to an administrative agency without a right to a jury trial.

Congress may do so even though the statute alternatively permits such claims to be brought in federal court, where the Seventh Amendment would guarantee the right to a jury trial.

Such a statutory scheme, under which a defendant's right to a jury trial is in large part contingent on procedural choices of other parties to the proceedings, does not violate the Due Process Clause.

February 8, 1985

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
CIVIL RIGHTS DIVISION

In response to your request we have reviewed the question whether Congress, without offending the jury trial requirement of the Seventh Amendment, may provide for an administrative adjudication and award of damages to an individual to remedy violations of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3619 (Fair Housing Act). Although we find the issue extremely difficult, we are inclined to believe that Congress may, consistent with the Constitution, assign adjudication of fair housing violations to an administrative agency absent a jury trial, even though Congress has provided that the same violations may alternatively be remedied by civil actions in which a jury trial is constitutionally required. *See Curtis* v. *Loether*, 415 U.S. 189 (1974). We are troubled, however, by a congressional enforcement scheme that enables an aggrieved person to obtain substantially similar relief in administrative or court proceedings, yet conditions the jury trial right of the defendant on the forum choice of other parties to the proceeding. Accordingly, we set forth our reasoning in detail below.

## I. Background

S. 1220, the Mathias-Kennedy bill to amend Title VIII of the Civil Rights Act of 1968, contains a complex enforcement scheme with two primary en-

forcement options: administrative proceedings and private civil actions. Section 810(a)(1) provides in part that the Secretary of Housing and Urban Development (Secretary) shall make an investigation "whenever an aggrieved person, or the Secretary on the Secretary's own initiative, files a charge alleging a discriminatory housing practice." If, after such an investigation, the Secretary determines that reasonable cause exists to believe the charge is true, the Secretary shall, on behalf of the aggrieved person filing the charge, either file an administrative complaint under § 811 or refer the matter to the Attorney General for the filing of an appropriate civil action under § 813(b). *See* § 810(c)(1).[1]

Section 811(a) provides for an administrative hearing on the record, which may result in an administrative order "providing for such relief as may be appropriate (including compensation for all damages suffered by the aggrieved person as a result of the discriminatory housing practice), and ... a civil penalty of not to exceed $10,000." The order of the administrative law judge is subject to review on appeal by an appeals panel of the Fair Housing Review Commission. *See* §§ 808(c), 811(a). A final order may be appealed within sixty days to the appropriate court of appeals. *See* § 811(b). Judicial review is conducted pursuant to the general provisions governing the review of orders of certain federal agencies. *See* 28 U.S.C. §§ 2341–2351. Findings of fact are conclusive if supported by substantial evidence in the record as a whole. The Attorney General is authorized to bring a civil action in district court to enforce any final order that is referred for enforcement by the Secretary, or to collect any civil penalty assessed by the administrative law judge under § 811(d)(1) for violation of a final order. *See* § 813(b).

Alternatively, § 812(a)(1) authorizes a private aggrieved individual to commence a civil action in an appropriate federal or state court. In such actions, the court shall award such relief as may be appropriate, including "money damages, equitable and declaratory relief, and punitive damages." § 812(c). This relief is similarly authorized for civil actions brought by the Attorney General under § 813.

If the Secretary has commenced an administrative hearing with respect to a charge made by an individual to the Secretary, that individual may not commence a private civil action. *See* § 812(a)(3). In parallel fashion, if an aggrieved individual has commenced a trial on the merits in a civil action, the Secretary may not commence administrative "proceedings toward the issuance of a remedial order based on such charge." § 812(a)(2).[2]

This scheme of mutually exclusive administrative and judicial enforcement options has an anomalous effect on a party's right to a jury trial. On the one

---

[1] The Secretary must refer to the Attorney General any "charges involving the legality or validity of any State or local zoning, or other land use law or ordinance, or any novel issue of law or fact or other complicating factor." § 810(c)(2).

[2] The Secretary may also investigate housing practices *sua sponte* to determine whether charges should be brought. *See* § 810(a)(1). The bill does not specify the forum in which such charges would be brought. We assume that it was intended that such charges might proceed administratively, although § 810(c)(1)(A) suggests that the administrative forum is limited solely to charges filed on behalf of aggrieved persons who previously have filed charges with the Secretary.

hand, no jury trial is available in the administrative proceedings. On the other hand, the Supreme Court has held that the Seventh Amendment entitles either party to demand a jury trial in an action for damages in the federal courts under current § 812 of the Civil Rights Act of 1968, which, similar to proposed § 812(a)(1), authorizes private plaintiffs to bring civil actions to redress violations of the fair housing provisions of the Act. *See Curtis* v. *Loether*, 415 U.S. 189 (1974). Consequently, although a defendant would be entitled to a jury if a plaintiff proceeds in federal court, the same defendant would have no right to a jury trial if an aggrieved person files a complaint with the Secretary and the Secretary subsequently files an administrative complaint.[3]

In order to resolve the constitutionality of this multiple enforcement scheme, we must address the following questions:

1. Can Congress constitutionally vest adjudication of housing discrimination claims in an administrative tribunal, in which there would be no right to a jury trial?

2. Given that a defendant would constitutionally be entitled to a jury trial in a damages action brought in federal court under the Fair Housing Act, can Congress simultaneously provide for an essentially similar action before an administrative tribunal, in which there would be no right to a jury trial, without violating the defendant's Seventh Amendment right?

3. Assuming that there are no Seventh Amendment concerns, does the statutory scheme nevertheless deny the defendant due process insofar as the defendant landlord's jury trial right is in large part contingent on the procedural choices of other parties?

## III. Analysis

1. *Can Congress constitutionally vest adjudication of housing discrimination claims in an administrative tribunal, in which there would be no right to a jury trial?* Before determining whether administrative adjudication of Fair Housing Act violations would offend an individual's Seventh Amendment right, a threshold question is whether administrative adjudication of the rights created by the Fair Housing Act comports with Article III of the Constitution. If Congress cannot constitutionally vest adjudication of certain housing discrimination claims in a non-Article III tribunal, then we need not reach the narrower Seventh Amendment issue.

Article III of the Constitution provides in part: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art.

---

[3] The reasoning of *Curtis* v. *Loether* might also apply if the Secretary refers the matter to the Attorney General and the Attorney General brings a civil action in federal court under § 813. Accordingly, a defendant's right to a jury trial might also be affected by the Secretary's determination either to proceed administratively or to refer the matter to the Attorney General for judicial proceedings. Because the Supreme Court has never determined whether the Seventh Amendment is applicable to government-initiated litigation, however, we decline to reach this issue. *See Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 449–50 n.6 (1977).

III, § 1. Moreover, "Judges, both of the supreme and inferior Courts," enjoy tenure "during good Behavior," and receive salaries not subject to diminution during their term of office. *Id.* There is no question that S. 1220 does not extend the Article III protections of life tenure and undiminished salary to the administrative law judges who would hear complaints filed by the Secretary under § 811. We therefore first examine whether Congress may commit adjudication of housing discrimination complaints brought by the Secretary on behalf of an individual, who may obtain relief in the form of compensatory damages, to officers not enjoying life tenure and irreducible compensation.

In creating statutory rights, Congress has considerable discretion to define in what manner and forum such rights may be vindicated. *See Crowell* v. *Benson,* 285 U.S. 22, 50–51 (1932); *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 284 (1856). Unfortunately, Supreme Court decisions defining the scope of Congress' discretion to vest federal judicial power in non-Article III tribunals involve one of the most confusing and controversial areas of constitutional law, *Glidden Co.* v. *Zdanok,* 370 U.S. 530, 534 (1962) (plurality opinion), and "do not admit of easy synthesis," *Northern Pipeline Co.* v. *Marathon Pipe Line Co.,* 458 U.S. 50, 91 (1982) (Rehnquist, J., concurring in judgment).

In particular, the Court's latest Article III pronouncement in *Northern Pipeline,* which concluded that the broad grant of jurisdiction to non-Article III bankruptcy courts was incompatible with the Constitution, failed to establish a unitary or comprehensive Article III jurisprudence. *Northern Pipeline* raised the question whether a non-Article III bankruptcy court could adjudicate a common law contract claim, brought by a company undergoing Chapter 11 reorganization against its purported debtor. Six Justices agreed that Article III prohibits a non-Article III federal tribunal from adjudicating state common law claims over the objection of a party. *Id.* at 87 (plurality opinion); *id.* at 91 (Rehnquist, J., concurring in judgment). Because only four members of the Court joined in the plurality's elaboration of Article III principles, we must explore the current problem not only in light of the plurality opinion but also with regard to the views of the concurring Justices.

The plurality opinion in *Northern Pipeline* examined two theories pursuant to which Congress may vest judicial power in non-Article III tribunals: the "legislative court" exception and the Article III court "adjunct" theory. According to the plurality, Congress may vest judicial power in legislative courts in "three narrow situations," all of which involve exceptional grants of power to the Executive and Legislative Branches. *Id.* at 64. These legislative court exceptions include "territorial courts," *see American Ins. Co.* v. *Canter,* 26 U.S. (1 Pet.) 511, 546 (1828), "courts-martial," *see Dynes* v. *Hoover,* 61 U.S. (20 How.) 65, 79 (1857), and cases involving "public rights," *see Murray's Lessee,* 59 U.S. (18 How.) at 284. The plurality's "adjunct" theory was based on the recognition that Article III "does not require 'all determinations of fact [to] be made by judges;' with respect to congressionally created rights, some factual determinations may be made by a specialized fact-finding tribunal

35

designed by Congress, without constitutional bar." *Northern Pipeline*, 458 U.S. at 81 (quoting *Crowell* v. *Benson*, 285 U.S. at 51) (citation omitted). But the functions of the adjunct must be limited so that "the essential attributes" of judicial power are retained in an Article III court. *Id.*

The adjudicatory scheme for housing discrimination claims created by S. 1220 clearly does not fall within the legislative court exception for territorial courts or courts-martial. A persuasive argument can be made, however, that S. 1220 creates a "public right" in establishing a duty not to discriminate in the provision of housing. The "public rights" doctrine was initially articulated in *Murray's Lessee*:

> [W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

59 U.S. (18 How.) at 284. That is, because Congress may constitutionally commit to nonjudicial executive determination matters that arise between the government and its citizens "in connection with the performance of the constitutional functions of the executive or legislative departments," *Crowell* v. *Benson*, 285 U.S. at 50, Congress is equally free to commit the determination of such matters to legislative courts or administrative agencies. Matters that fall within the public rights doctrine may involve the entire range of Congress' Article I powers: "Familiar illustrations of administrative agencies created for the determination of such matters are found in connection with the exercise of the congressional power as to interstate and foreign commerce, taxation, immigration, the public lands, public health, the facilities of the post office, pensions and payments to veterans." *Id.* at 51; *see also Atlas Roofing Co.* v. *Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 456–57 (1977); *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U.S. 320, 339 (1909).[4]

The difficulty, as the Supreme Court has conceded, is that "the distinction between public rights and private rights has not been definitively explained in [the Court's] precedents." *Northern Pipeline*, 458 U.S. at 69 (plurality opinion). A threshold definition of public rights is that they arise "between the government and others." *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929). Private rights, in contrast, involve "the liability of one individual to another under the

---

[4] The Court has refused to limit Congress' discretion to create public rights and to establish legislative tribunals in which to adjudicate them to particular Article I grants of power that might be deemed "inherently in the exclusive domain of the Federal Government and critical to its very existence — the power over immigration, the importation of goods, and taxation." *Atlas Roofing Co.*, 430 U.S. at 456.

law as defined." *Crowell* v. *Benson*, 285 U.S. at 51. Moreover, "the presence of the United States as a proper party to the proceeding is a necessary but not sufficient means of distinguishing 'private rights' from 'public rights.'" *Northern Pipeline*, 458 U.S. at 69 n.23 (plurality opinion).

In the administrative scheme established by S. 1220, the Secretary files a complaint "on behalf of the aggrieved person." § 810(c)(1)(A). The aggrieved person has the right to intervene in the proceedings. § 811(a). Although the administrative official has discretion to provide compensatory damages relief for the aggrieved person, the bill does not authorize the administrative award of punitive damages (which are available in individual court actions brought under § 812). Further, a civil penalty not to exceed $10,000 is available to the government. In these latter two respects — the exclusion, in the administrative proceeding, of punitive damages for the individual and the availability of a civil penalty for the government — S. 1220 differs from an earlier housing discrimination bill that this Office concluded was constitutionally vulnerable. *See* "Fair Housing — Civil Rights Act," 2 Op. O.L.C. 16 (1978). The earlier bill authorized administrative officials to award punitive damages to individuals and did not provide for a civil penalty for the government.

We believe it is a close question whether the government has simply stepped into the individual's shoes in this administrative proceeding, and is suing in a representative capacity, or whether S. 1220 in fact creates a public right that, consistent with Article III, may be adjudicated in an administrative tribunal. *Cf. EEOC* v. *Corry Jamestown Corp.*, 719 F.2d 1219, 1225 (3d Cir. 1983) (EEOC has right to jury trial in court action under Age Discrimination in Employment Act in order to avoid "inequitable and anomalous result" of individual losing his Seventh Amendment right whenever EEOC sues on his behalf). This determination is complicated because S. 1220 concurrently provides for an essentially similar individual damages action in court, an action that resembles the current damages action under the Fair Housing Act. The Supreme Court has declared that existing actions under § 812 are actions "to enforce 'legal rights' within the meaning of our Seventh Amendment decisions," *Curtis* v. *Loether*, 415 U.S. at 195, and are "analogous to a number of tort actions recognized at common law," *id.* Significantly, there are only minimal differences between the relief available in the administrative forum (in which a civil penalty for the government replaces punitive damages for the individual) and the judicial forum.

Nonetheless, there are clearly precedents for administrative bodies both enforcing public policy and providing incidental relief, including monetary relief, to private citizens. As courts have recently noted in the context of administratively determined reparations awards under the Commodity Exchange Act, the fact that new statutory rights are enforceable in favor of a private party does not preclude administrative adjudication of such rights. *Myron* v. *Hauser*, 673 F.2d 994, 1005 (8th Cir. 1982) (citing *Atlas Roofing Co.*, 430 U.S. at 452–55); *Rosenthal & Co.* v. *Bagley*, 581 F. 2d 1258, 1261 (7th Cir. 1978) (same). In *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937), for

37

example, the Court upheld an administrative award of both reinstatement and back pay for an employee. Somewhat similarly, in *Block* v. *Hirsh*, 256 U.S. 135 (1921), the Court rejected a constitutional challenge to a statute that temporarily suspended the legal remedy of ejectment and established an administrative tribunal to determine fair rents while tenants held over notwithstanding the expiration of their leases. Just as the *Northern Pipeline* plurality distinguished between the restructuring of debtor-creditor relations, which "may well be a 'public right,'" 458 U.S. at 71, and the adjudication of state-created private rights, a distinction exists between the government-prosecuted administrative proceeding in S. 1220 and the individual damages action in federal court.

Unquestionably, the determination that S. 1220 creates a public right would be considerably simplified if no compensatory relief were available to the individual in the administrative proceeding. We believe, however, that the courts would conclude that insofar as S. 1220 creates a right (1) in an area of important public concern, *cf. Bob Jones Univ.* v. *United States*, 461 U.S. 574, 594–96 (1983) (identifying a firm national policy against racial discrimination), (2) that is enforceable by the government in an administrative action, (3) provides a civil penalty for the government, and (4) does not to provide the aggrieved individual the punitive damages typically available at common law, *see Richerson* v. *Jones*, 551 F.2d 918, 926–28 (3d Cir. 1977), it probably is to be characterized as a public right.

This determination is consistent with case law that has rejected Article III and Seventh Amendment challenges to the reparations procedure of the Commodity Exchange Act (CEA), 7 U.S.C. § 18 (1976), under which an individual may obtain a monetary award from an administrative tribunal. The 1974 amendments to the CEA established a reparations procedure, "analogous to the operation of a small claims court," S. Rep. No. 850, 95th Cong., 2d Sess. 16 (1978), in which a customer, often representing himself *pro se*, could obtain damages from registered commodities brokers and certain other professionals for violations of the CEA or any Commodity Futures Trading Commission (CFTC) regulations, rules, or orders. *Myron* v. *Hauser*, 673 F.2d at 1001; *Rosenthal & Co.* v. *Bagley*, 581 F.2d at 1259. Under the 1974 amendments, an individual could file a complaint with the CFTC, which was authorized to investigate the complaint. 7 U.S.C. § 18(a), (b) (1976). If the CFTC determined that the "facts warranted such action," the CFTC notified the accused commodity professional and afforded a hearing before an administrative official. *Id.* § 18(b).[5] Thus, although the CFTC provided a forum for resolution of these

---

[5] The 1983 amendments simplified the statutory procedural requirements, but did not alter the administrative scheme in any significant manner. The CEA now provides that any person complaining of a violation of the CEA by any registered person may "apply to the Commission for an order awarding actual damages proximately caused by such violation." 7 U.S.C. § 18(a). The 1983 amendments eliminated the specific provisions empowering the CFTC to investigate any complaint, and requiring the CFTC to forward the complaint, if warranted, to the respondent for an answer. The CFTC now has general discretion to "promulgate such rules, regulations, and orders as it deems necessary or appropriate for the efficient and expeditious administration of this section." *Id.* § 18(b).

claims, it did not directly assume a prosecutorial role. Rather, complainants could retain private counsel or represent themselves before the administrative law judge. *Myron* v. *Hauser*, 673 F.2d at 1001.

The *Bagley* court summarily dismissed an Article III objection to this congressionally-mandated scheme for administrative adjudication of reparations claims as "not even arguable." 581 F.2d at 1261. The court in *Myron* v. *Hauser*, however, explained why it did not think that purely private rights were involved in the administrative proceedings. Although conceding that "the present case is not one 'in which the Government *sues* in its sovereign capacity to enforce public rights,'" the court nevertheless believed that the case was "one in which 'the Government [was] *involved* in its sovereign capacity under an otherwise valid statute creating enforceable public rights.'" 673 F.2d at 1005 (emphasis added; citations omitted). Because Congress, acting under the Commerce Clause, had regulated commodity options transactions, the court regarded the case "in a functional sense [as] one between the government and the commodity options broker, the party subject to government regulation." *Id.*

Under S. 1220, Congress would not simply be regulating the nondiscriminatory provision of housing; the government would also be prosecuting alleged violations of the Fair Housing Act in administrative proceedings. If the *Myron* court concluded that the CEA created a public right that could be adjudicated in an administrative tribunal, even though the statute was enforceable by, and in favor of, private parties, then it certainly would conclude that S. 1220, which is enforceable by the government, creates a public right, the benefits of which also redound in part to aggrieved individuals.

Alternatively, the use of administrative tribunals to adjudicate the right to nondiscriminatory housing created by S. 1220 might be validated by the "adjunct" theory articulated by the plurality in *Northern Pipeline*. The plurality regarded *Crowell* v. *Benson* and *United States* v. *Raddatz*, 447 U.S. 667 (1980), as establishing two principles that define the extent to which Congress may constitutionally vest judicial functions in non-Article III adjuncts. First, "when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated including the assignment to an adjunct of some functions historically performed by judges." *Northern Pipeline*, 458 U.S. at 80 (plurality opinion). Second, "the functions of the adjunct must be limited in such a way that 'the essential attributes' of judicial power are retained in the Art. III court." *Id.* at 81.

In *Crowell*, the Supreme Court upheld an administrative agency's power to make factual determinations concerning the nature and extent of employee injuries, pursuant to a federal statute requiring employers to compensate their employees for work-related injuries occurring upon the navigable waters of the United States. In *Raddatz*, the Court upheld the Federal Magistrates Act, which permits magistrates to adjudicate, subject to *de novo* review by the district court, certain pretrial motions involving constitutional claims. Because *Crowell*, like S. 1220, involved congressionally created rights (in contrast to common law or constitutional claims), with respect to which Congress possesses rela-

tively broad discretion to assign fact-finding to adjuncts, it is the more relevant touchstone for the present analysis.[6]

In *Crowell*, the administrative agency performed an admittedly narrower function than would the agency under S. 1220. The federal statute at issue there provided for compensation of injured employees "irrespective of fault" and prescribed a fixed schedule of compensation. 285 U.S. at 38. In view of these limitations on the agency's functions and powers, the Court found that the agency's determinations were "closely analogous to findings of the amount of damages that are made, according to familiar practice, by commissioners or assessors." *Id.* at 54. Although S. 1220 does not impose such narrow limitations on the housing discrimination agency's fact-finding powers, neither does the bill create adjuncts with powers as broad as those possessed by the bankruptcy courts at issue in *Northern Pipeline*.

The Bankruptcy Act of 1978 vested bankruptcy judges with all the powers of a court of equity, law, and admiralty, including the power to preside over jury trials, to issue writs of habeas corpus, and to issue any order or judgment appropriate for the enforcement of the provisions of Title 11. *Northern Pipeline*, 458 U.S. at 85 (plurality opinion).[7] In contrast, the administrative tribunal in S. 1220, similar to the agency considered in *Crowell*, lacks many of these powers, and specifically has no power to enforce its orders. Moreover, the subject matter jurisdiction of the agency created under S. 1220 is limited to congressionally-created claims of housing discrimination, whereas the jurisdiction of the bankruptcy courts under the 1978 Bankruptcy Act encompassed not only traditional matters of bankruptcy, but also all civil proceedings arising under or *related to* cases under Title 11. *See* 28 U.S.C. § 1471(b) (Supp. IV 1980) (emphasis added).

According to both the *Northern Pipeline* plurality and the Court in *Crowell*, the most significant aspect of the adjunct scheme challenged in *Crowell* was that "'the reservation of full authority to the court to deal with matters of law provides for the appropriate exercise of the judicial function in this class of cases.'" *Northern Pipeline*, 458 U.S. at 81 (quoting *Crowell* v. *Benson*, 285 U.S. at 54). S. 1220 provides that the factual findings of the agency are conclusive if supported by substantial evidence, but the reviewing judicial court retains greater authority with respect to matters of law.[8] Because S. 1220

---

[6] The *Northern Pipeline* plurality emphasized that Congress does not possess the same degree of discretion to assign "traditionally judicial power to adjuncts engaged in the adjudication of rights *not* created by Congress," 458 U.S. at 81–82, and noted that "Congress' assignment of adjunct functions under the Federal Magistrates Act [under which constitutional, as opposed to solely congressionally-created, rights could be adjudicated] was substantially narrower than under the statute challenged in *Crowell*," *id.* at 82.

[7] The only exception to these wide-ranging powers was that bankruptcy courts could "not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment." 28 U.S.C. § 1481 (Supp. IV. 1980) (*quoted in Northern Pipeline*, 458 U.S. at 55 (plurality opinion)).

[8] *See* 28 U.S.C. § 2347; *Florida E. Coast Ry.* v. *United States*, 242 F. Supp 490, 491 (M.D. Fla.) (statute providing for judicial review of agency action requires that primary function of reviewing court is to determine whether there is substantial evidence on the record as a whole to support findings of agency, and whether agency applied proper legal standards in conduct of proceedings before it and in conclusions that it

Continued

40

involves a congressionally-created right, in distinction to the state common law claim at issue in *Northern Pipeline*, we do not believe that the assignment of initial adjudicatory functions to an adjunct administrative tribunal is necessarily incompatible with Article III. *Cf. Schor* v. *CFTC*, 740 F.2d 1262 (D.C. Cir. 1984) (holding that *Northern Pipeline* principles concerning congressional discretion to assign judicial power to adjuncts were not satisfied in case involving agency jurisdiction over common law claim). Because this determination is a close and questionable one, however, we prefer to base our conclusion — that S. 1220 does not violate Article III by vesting administrative officials with power to adjudicate fair housing claims — on the "public rights" theory.

The concurrence in *Northern Pipeline* offers little to either support or detract from the above conclusions regarding S. 1220. The concurrence limited its holding to the case before it, concluding that the Bankruptcy Act of 1978 violated Article III to the extent that it permitted a non-Article III tribunal to adjudicate a state common law claim. 458 U.S. at 91. But "sensible interpretation of judicial opinions avoids converting a carefully crafted limitation on a holding into its *ratio decidendi*." *Schor* v. *CFTC*, 740 F.2d at 1275. Quite simply, the concurrence provides scant insight concerning whether S. 1220 creates either a public right or a constitutionally acceptable adjunct system. Because the Article III principles supporting the concurring opinion are in any event no stricter than the plurality's Article III principles, we believe that to the extent S. 1220 passes muster under the plurality's "public rights" theory, it would probably be endorsed by a majority of the Court.

B. *Given that a defendant would constitutionally be entitled to a jury trial in a damages action brought in federal court under the Fair Housing Act, can Congress simultaneously provide for an essentially similar action before an administrative tribunal, in which there would be no right to jury trial, without violating the defendant's Seventh Amendment right?* Assuming that S. 1220 creates a public right, there is no question that Congress has discretion to assign the adjudication thereof to an administrative agency free from the strictures of the Seventh Amendment: "When Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" *Atlas Roofing Co.*, 430 U.S. at 455; *see also NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. at 48–49. S. 1220, however, does not simply assign adjudication of a

---

[8] (. . . continued)
reached), *aff'd*, 382 U.S. 161 (1965); *see also Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 491 (1951) Such a standard of review does not permit the reviewing court to substitute its own views for the agency's judgment, if that judgment has support in the record and applicable law, *see American Textile Mfrs Inst.* v. *Donovan*, 452 U.S. 490, 523 (1981); *New York* v. *United States*, 299 F. Supp. 989, 997 (N.D.N.Y. 1969), *aff'd*, 396 U.S. 281 (1970), but it does leave questions of law to the court's determination, *NLRB* v. *Yeshiva University*, 444 U.S. 672, 691 (1980); *Florida Power & Light Co.* v. *Electrical Workers*, 417 U.S. 790, 803 (1974); *cf. NLRB* v. *Bell Aerospace Co.*, 416 U.S. 267 (1974); *NLRB* v. *Hearst Publications, Inc*, 322 U.S. 111, 130–31 (1944).

41

public right to an administrative tribunal. It simultaneously establishes a statutory cause of action (to remedy the same underlying housing discrimination claim) that an individual may bring in state or federal court.

This individual damages action is virtually identical to the cause of action at issue in *Curtis* v. *Loether*.[9] In that case, the Court held that parties to such an action in federal court are entitled to a jury trial on demand. 415 U.S. at 195–97. The Court explained that the right to jury trial extends beyond the common law forms of action recognized in 1791, and that the Court has often found the Seventh Amendment applicable to causes of action based on statutes. *Id.* at 193. In general, "when Congress provides for enforcement of statutory rights in an ordinary civil action in the district courts, where there is obviously no functional justification for denying the jury trial right, a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law." *Id.* at 195. Because a damages action under the Fair Housing Act "is analogous to a number of tort actions recognized at common law," the Court concluded that it "is an action to enforce 'legal rights' within the meaning of our Seventh Amendment decisions." *Id.* Consequently, to the extent S. 1220 provides for enforcement in federal court of a statutory action involving legal rights and remedies that the Court has deemed analogous to certain common law actions, a jury trial is constitutionally required upon demand. *Id.* at 195; *Pernell* v. *Southall Realty*, 416 U.S. 363, 383 (1974).

The critical question posed by S. 1220 is whether a statutory right to be free from discrimination in the sale, rental, or financing of housing can be both a right enforceable in an administrative action absent a jury trial and a right enforceable in federal court with a jury upon demand.

The Court has long recognized that Congress has discretion to vest the determination of public rights in judicial or administrative tribunals. Thus, Congress:

> in exercising the powers confided to it, may establish "legislative" courts . . . to serve as special tribunals "to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it." But "the mode of determining matters of this class is completely within congressional control. Congress may reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals."

*Crowell* v. *Benson*, 285 U.S. at 50 (quoting *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929)). Similarly, the plurality in *Northern Pipeline* acknowledged that:

> when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign

---

[9] The only difference is that the current Fair Housing Act provision, which was addressed in *Curtis* v. *Loether*, limits the individual's punitive damages to $1,000. *See* 42 U.S C § 3612. S. 1220 places no limit on the punitive damages available to an individual in a civil court action. *See* § 812(c).

burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created.

458 U.S. at 83 (footnote omitted).

In light of Congress' substantial discretion to prescribe the manner in which "public" or statutorily created rights may be adjudicated, we cannot conclude that Congress deprives itself of the power to vest a statutorily created right to nondiscriminatory housing in an administrative agency simply because it also has provided for the enforcement of the same statutory housing right in the federal courts in which a jury trial must be available. That is, we believe that Congress may create a statutory right that, depending on its mode of enforcement, the forum in which it is to be resolved, or the nature of the remedy available, could be viewed either as a public or a private right. *Cf. Merrill Lynch, Pierce, Fenner & Smith* v. *Curran*, 456 U.S. 353, 384–88 (1982) (holding that implied private cause of action in court is available under Commodity Exchange Act, although Act also expressly provides for administrative reparations procedure and arbitration procedure).

Prior cases consistently indicate that the Seventh Amendment does not prohibit Congress from assigning the adjudication of statutory rights to an administrative forum, even if a jury would have been required constitutionally had Congress assigned adjudication of those same rights to a federal court instead. *Atlas Roofing Co.*, 430 U.S. at 455 (discussing *Pernell* v. *Southall Realty*, *NLRB* v. *Jones & Laughlin Steel Corp.*, and *Block* v. *Hirsh*). In *Pernell* v. *Southall Realty*, the Court held that because Congress provided that statutory actions for repossession of property — which resembled common law actions to recover land — be brought as civil actions in court, the Seventh Amendment required preservation of the right to jury trial. 416 U.S. at 384. The Court carefully noted, however, that "we may assume that the Seventh Amendment would not be a bar to a congressional effort to entrust landlord-tenant disputes, including those over the right to possession [and therefore analogous to a common law action], to an administrative agency." *Id.*

Similarly, in *Atlas Roofing Co.*, in which the petitioners strenuously argued that the statutory civil penalty proceeding in issue there was a suit at common law within the meaning of the Seventh Amendment, the Court concluded that "even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a federal court of law," 430 U.S. at 455, the Amendment did not prevent Congress from assigning adjudication of such civil penalties to an administrative agency with which a jury trial would be incompatible. *Id.* at 455, 461.

Finally, in *Block* v. *Hirsh*, 256 U.S. 135 (1921), the Court upheld Congress' power to transfer temporarily to an administrative commission jurisdiction

over an entire range of landlord-tenant disputes that previously had been adjudicated in court with a jury trial right. If Congress by statute could wholly, albeit temporarily, remove a set of common law actions from the courts and subject the regulation and adjudication of the same underlying property rights to an administrative agency, then the Seventh Amendment would not appear to bar the less drastic action of providing simultaneously for the adjudication of a statutory right in individual judicial actions and in administrative proceedings prosecuted by the government.[10] As the Court explained in *Atlas Roofing*, Congress cannot utterly destroy the right to a jury trial by providing for administrative rather than judicial resolution of the vast range of wholly private tort, contract, and property cases that now arise in the courts. 430 U.S. at 457–58. But "where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights," *id.* at 458, then the right to a jury trial may well be affected by the identity of the forum to which Congress chooses to submit a dispute, *id.* at 457–58. *See also Myron* v. *Hauser*, 673 F.2d at 1004 ("right to a jury trial turns not solely on the nature of the issue to be resolved but also on the forum in which it is to be resolved"); *Rosenthal & Co.* v. *Bagley*, 581 F.2d at 1261 (same).

Although we are unaware of statutory schemes in which the individual's jury trial right is contingent on whether the government enforcement official chooses to proceed in an administrative forum or an individual proceeds in court, we find nothing in the Seventh Amendment that would prohibit such a congressionally devised system.[11] The Supreme Court has stated that "Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field." *Atlas Roofing Co.*, 430 U.S. at 455. Nor do we find anything inherently impermissible in Congress making a jury trial available in certain instances but not in others in the enforcement of the same right. In *Ross* v. *Bernhard*, 396 U.S. 531 (1970), the Court acknowledged that prior to the adoption of the Federal Rules of Civil Procedure in 1938, which merged the law and equity functions of the federal courts, a defendant would not be entitled to a jury trial in a stockholder's derivative suit, even though the defendant

---

[10] We also note that Congress has the power to avoid the strictures of the Seventh Amendment to the extent it can control the jurisdiction of the inferior federal courts, *see* U.S. Const. art. III, § 1; *Sheldon* v. *Sill*, 49 U.S. (8 How.) 441, 449 (1850), and thereby transfer judicial business to the state courts, in which the Seventh Amendment is inapplicable. *See Alexander* v. *Virginia*, 413 U.S. 836 (1973). This does not, of course, resolve whether Congress, while continuing to exercise federal power to decide disputes, may eliminate the right of trial by jury simply by changing the *federal* forum. But it illustrates Congress' considerable discretion either to make jury trials available or to exempt adjudication from any Seventh Amendment claims.

[11] The Commodity Exchange Act (CEA) appears to establish an enforcement structure most analogous to S. 1220. Under the CEA, an individual may proceed with a private damages action in court, in which a jury trial would be available, or the individual may file a complaint seeking an administrative award of damages. Although the complaining individual, as opposed to a CFTC official, prosecutes the administrative claim, the administrative reparations procedure will go forward only if the CFTC determines that the complaint warrants administrative action. 17 C.F.R. § 12.15. However, the reparations procedure is not available against the commodities exchanges, nor is it suited for the adjudication of all other claims under the CEA. *See Merrill Lynch*, 456 U.S. at 384–85.

44

would have had a right to a jury trial had the corporation itself sued on the same underlying claim. *Id.* at 536–37, 540.[12]

Significantly, in *Merrill Lynch*, the Court recently sanctioned the availability of both an individual court action, in which a jury trial presumably would be available upon demand, *see Miller* v. *New York Produce Exch.*, 550 F.2d 762 (2d Cir.), *cert. denied*, 434 U.S. 825 (1977), and administrative proceedings, in which an injured individual could obtain damages from another private party absent a jury trial. The Court there held that Congress intended to preserve a private judicial remedy as a supplement to the express enforcement provisions — an administrative reparations procedure, an arbitration procedure provided by every contract market, and state *parens patriae* actions — under the CEA. Although the Court found that the informal arbitration and reparations procedures were designed to supplement the private judicial remedy, and that Congress apparently intended complainants "to be put to the choice between informal and judicial actions," 456 U.S. at 385, there was no question that damages could be obtained from a futures commission merchant or other registered person in either administrative reparations proceedings absent a jury trial or in a private judicial action, *id.* at 366, 385–87.[13] Nevertheless, the Court expressed no concern that the Seventh Amendment might prohibit an interpretation of the statute authorizing the award of damages in favor of a private complainant in either an administrative proceeding absent a jury trial or in a judicial proceeding with a jury available on demand.

Consequently, assuming that S. 1220 involves a public or statutorily created right that Congress may, compatible with Article III, assign to an adjunct for adjudication, we do not believe that the Seventh Amendment places any independent constraint on Congress' discretion to provide for both administrative and judicial enforcement if it determines that alternative mechanisms are necessary to remedy a particular problem. *Cf. Atlas Roofing Co.*, 430 U.S. at 444–45 (finding that Congress enacted OSHA because it found existing state statutory and common law remedies inadequate to protect employees from unsafe working conditions). Insofar as the administrative proceeding provides a remedy for a congressionally created right, Congress has latitude to alter the scope of the jury trial right as a reasonably necessary incident to other procedural and substantive objectives, because doing so, by definition, does not withdraw the jury trial in an area where historically it was firmly established.

C. *Assuming there are no Seventh Amendment concerns, does the statutory scheme nevertheless violate due process insofar as the defendant's jury trial*

---

[12] Similarly, because the Seventh Amendment does not apply in actions against the federal government, persons seeking relief from the federal government on causes of action in which they would have had a jury trial right were the action brought against a non-federal party will often have no jury trial right. *See Lehman* v. *Nakshian*, 453 U.S. 156 (1981) (holding that although jury trial was generally available in Age Discrimination in Employment Act suits, Congress did not create a jury trial in suits against the federal government).

[13] Moreover, because the CFTC under the CEA, similar to the Secretary under S. 1220, determines whether a complaint warrants further administrative action, *see* 17 C.F.R. § 12.15, both schemes ultimately vest a government official with some authority to determine whether a defendant will appear in an administrative forum or a judicial forum.

*right is in large part contingent on the procedural choices of other parties*? Generally, statutory schemes do not give the government discretion to enforce the same underlying charge by pursuing somewhat similar remedies either administratively without a jury or in court with a jury. Nor is it customary for statutes to provide a choice between individual court actions with jury trials and government-initiated proceedings in administrative forums. Most statutes that create dual enforcement mechanisms authorizing government suits as well as private actions either provide for jury trials in court actions regardless who enforces the statutory right,[14] or do not make jury trials available, irrespective of whether the government or a private person is the enforcing party.[15]

These congruences do not exist, however, if statutory provisions provide different remedies to enforce the same underlying claim in a judicial forum. For example, § 17 of the Fair Labor Standards Act (FLSA) authorizes the Secretary of Labor to seek injunctive relief, including the restitutionary restraint of any withholding of wages found due, in court without a jury trial, while § 16 of the FLSA grants the Secretary and private parties authority to seek legal relief in court with a jury trial. *Wirtz* v. *Jones*, 340 F.2d 901 (5th Cir. 1965). The Age Discrimination in Employment Act (ADEA) similarly authorizes the Equal Employment Opportunity Commission (EEOC) to seek an injunctive remedy in court, for which no jury trial is available, to enforce the statutory prohibition against age discrimination, whereas an individual employee may proceed with a damages actions under the ADEA in which a jury trial would be required upon demand. *See* 29 U.S.C. § 626(b) (providing that the ADEA is to be enforced in accordance with powers, remedies, and procedures of FLSA). Significantly, under both the FLSA and the ADEA, the individual's right to bring a private action terminates upon the filing of a complaint by the Secretary or the EEOC, respectively. *See id.* § 216(b) (FLSA); *id.* § 626(c)(1) (ADEA); *Donovan* v. *University of Tex.*, 643 F.2d 1201, 1207 (5th Cir. 1981). Should the Secretary seek equitable rather than legal relief, the parties would have no right to a jury trial even though a jury trial would have been available had an individual brought a damages action. *See Wirtz* v. *Jones*, 340 F.2d at 904. Thus, simply because a party may have a right to a jury trial in certain instances when a particular right is being enforced against him, it does not follow that a jury trial is always available for that party in the enforcement of that right.

In this context, it is significant that S. 1220 provides for somewhat different remedies in jury and non-jury proceedings. Punitive damages for the individual are available in judicial actions under S. 1220; compensatory damages for the

---

[14] *See EEOC* v. *Brown & Root, Inc* , 725 F.2d 348 (5th Cir. 1984) (jury trial available whether government sues under § 7(b) or private party sues under § 7(c) of Age Discrimination in Employment Act); *EEOC* v. *Corry Jamestown Corp.*, 719 F.2d 1219 (3d Cir. 1983) (same); *Wirtz* v. *Jones*, 340 F.2d 901, 904 (5th Cir. 1965) (§ 16 actions under Fair Labor Standards Act brought by either an employee or the Secretary are triable before a jury).

[15] *See Slack* v. *Havens*, 522 F.2d 1091, 1094 (9th Cir. 1975) (no jury trial right in Title VII suits); *cf. Great Am. Fed. Savs. & Loan Ass'n* v. *Novotny*, 442 U.S. 366, 375 (1979) (noting that courts of appeals have held that no jury trial right exists in Title VII actions because all relief is equitable in nature).

individual and a civil penalty for the government are available in the administrative proceedings. Because the Supreme Court has never held it unfair or arbitrary to have juries available some of the time but not all of the time, depending on the nature of the right, the remedy and the forum in which the right is enforced, we find nothing in the Due Process Clause that precludes Congress from providing for the enforcement of the statutory right to nondiscriminatory housing in either an administrative forum without a jury or a judicial forum with a jury. *Cf. Anniston Mfg. Co. v. Davis*, 301 U.S. 337 (1937) (holding that Congress may abrogate judicial proceedings if the substituted administrative proceedings afford a fair and adequate remedy). Indeed, it would be anomalous to conclude that the Due Process Clause places a more severe constraint on Congress' discretion to vest adjudication of congressionally created rights in administrative forums than do the more specific commands of the Seventh Amendment or Article III.

## Conclusion

Because we believe that the courts would characterize the statutory right to nondiscriminatory housing created by S. 1220 as a public right, Congress may, consistent with Article III, vest the adjudication of housing discrimination claims in an administrative tribunal. Moreover, we conclude that the Seventh Amendment does not prohibit Congress from vesting the adjudication of this congressionally created right both in federal court, in which a jury trial would be available upon demand, and in an administrative tribunal, in which there would be no right to a jury trial. Finally, we believe that a statutory scheme in which a defendant's jury trial right is in large part contingent on the procedural choices of other parties to the proceeding does not offend the Due Process Clause. We accordingly conclude that although the question is novel and the available judicial precedents provide uncertain guidance, Congress constitutionally may provide for an administrative award of compensatory damages to an individual, even though such damages are also statutorily authorized in judicial actions in which either party is entitled to a jury trial on demand.

RALPH W. TARR
*Acting Assistant Attorney General*
*Office of Legal Counsel*

47